UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In re CITY OF CENTRAL FALLS, | ) | |
| | ) | |
| RHODE ISLAND | ) | Case No. _____ |
| | ) | |
| | ) | |
| Debtor | ) | Chapter 9 |

### DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF STATEMENT OF QUALIFICATIONS UNDER BANKRUPTCY CODE SECTION 109(c)

The City of Central Falls, Rhode Island (the "City"), by and through its state-appointed Receiver, Robert G. Flanders, Jr., submits the following Memorandum of Fact and Law in support of its Statement of Qualifications Under Section 109(c) of the United States Bankruptcy Code, filed herewith. The City also relies on and incorporates by reference the Affidavit of Mark A. Pfeiffer, annexed hereto as **Exhibit A** ("Pfeiffer Aff."), the Affidavit of Robert G. Flanders, Jr., annexed hereto as **Exhibit B** ("Flanders Aff."), the Affidavit of Gayle A. Corrigan Regarding Labor Negotiations, annexed hereto as **Exhibit C** ("Corrigan Labor Negotiations Aff."), and the Affidavit of Gayle A. Corrigan with Respect to the City's Finances, annexed hereto as **Exhibit D** ("Corrigan Finances Aff."), filed herewith.

### I.    INTRODUCTION

The City has filed a petition seeking relief under Chapter 9 of the Bankruptcy Code. The City's financial condition has deteriorated to the point where it is insolvent. The overwhelming pension obligations and the slowing economy, among other factors, have significantly decreased revenues while the City's operational costs have increased. The unfunded pension obligations, combined with its health insurance obligations, is approximately $80 million on an actuarial basis. The City has an structural deficit of approximately $5 million on a budget of

approximately $16.4 million.  Financial projections demonstrate that the deficit in Fiscal Year

ended June 30, 2012 ("FY 2012")[1] will be significantly worse than the deficit was in Fiscal Year

ended June 30, 2011 ("FY 2011"), with deficits projected to grow thereafter.  On or before

August 31, 2011, the City will lack sufficient revenues or cash flow to pay its bills as they

become due, and then will not be able to pay its debts as they become due in every succeeding

month for the remainder of the fiscal year (which ends on June 30, 2012) except for the month of

October 2011.  The City already maintains an operating deficit in excess of $2.3 million on its

books from Fiscal Year ended June 30, 2010 ("FY 2010") and FY 2011.  In addition, the City is

no longer able to access capital markets.  Consequently, the City is insolvent.

The City is a municipal corporation in the State of Rhode Island.  There is a mayor and

five-member city council elected by the voters of the City.  On May 18, 2010, the City Council,

by resolution, along with the Mayor authorized the filing of a petition for the appointment of a

receiver for the City.  On June 9, 2010, the Rhode Island Senate passed the Act Relating to Cities

and Towns – Providing Financial Stability, G.L. 1956 § 45-9-1, et seq. (the "Fiscal Stability

Act").  On June 10th the Rhode Island House of Representatives passed the Fiscal Stability Act.

And, on June 11th the Governor, the Honorable Donald Carcieri, signed the Fiscal Stability Act

into law.  R.I.G.L. § 45-9-8 authorizes the Director of Revenue, in consultation with the Auditor

General, to appoint a receiver for a city or town in the event of a fiscal emergency.  On July 16,

2010, Rosemary Booth Gallogly, Acting Director of the Department of Revenue, appointed

Retired Superior Court Justice Mark A. Pfeiffer to act as receiver pursuant to the Fiscal Stability

Act.  *See* "Report of the State Receiver to The Honorable Donald L. Carcieri, Governor of the

State of Rhode Island, and Rosemary Booth Gallogly, Director of Revenue, State of Rhode

Island," dated December 14, 2010, and annexed to Pfeiffer Aff. as *Exhibit D*.  (hereinafter,

---

[1] The Central Falls fiscal year runs from July 1 of each year through June 30 of the following year.

"Receiver's Report."). Former Supreme Court Justice Robert G. Flanders, Jr., was appointed and assumed his duties as successor receiver as of February 1, 2011. Flanders Aff. ¶ 1.

The City has reduced or eliminated funding for almost all programs and services beyond levels, including the elimination of certain essential educational and social service functions. The substantial majority of the City's expenditures are allocated to pay labor costs, including salaries and benefits of current employees and pension costs of retirees. These costs are mostly controlled by collective bargaining agreements, the terms of which the City cannot unilaterally change outside of Chapter 9. Due to contractual salary increases, the City's labor costs will increase in the next fiscal year which will also have the effect of increasing its current and future pension obligations. Corrigan Finances Aff., ¶¶ 27-29.

Given the fact that the majority of the City's expenditures are associated with labor costs, including salaries and benefits of current employees, and pension and health insurance benefits for retirees, the City recognizes that it must find a way to reduce its annual expenditures on labor as the centerpiece of any viable recovery plan. The City has engaged the labor unions in negotiations; however they have been unsuccessful in reaching any agreement. The City has met with its retirees, also to no result. If the City is to avoid defaulting on its financial obligations, it has no option other than to seek Chapter 9 relief.

In connection with its petition, the City has filed its Statement of Qualifications Under Section 109(c) in which it has certified that the City satisfies each of the five (5) eligibility criteria set forth in Section 109(c). Below, the City details the facts and law that demonstrate that its certification is correct, and that it is "eligible" for Chapter 9 relief.

## II.    FACTUAL BACKGROUND

### A.    The City's Deficit and Unfunded Obligations.

The chronology of events leading up to the City's current fiscal crisis is detailed in the Receiver's Report.  Pfeiffer Aff., Exhibit D.

On July 19, 2010, the state-appointed receiver, Judge Pfeiffer assumed control of the City's affairs.  At that time, the City was approximately three (3) weeks into FY 2011.  A budget for FY 2011 had not been established, and the actual extent of the FY 2010 deficit was unknown. Pfeiffer Aff., ¶ 10.

Once the City's FY 2010 closing balance was estimated in August 2010, the Receiver focused on developing the City's FY 2011 budget.  Using the FY 2010 adopted budget and Fiscal Year ended June 30, 2009 ("FY 2009") and FY 2010 actual expenditures as a basis, a baseline budget was developed that revealed a structural budget deficit of approximately $6.3 million.  Total revenues for FY 2011 were estimated at approximately $14.8 million, and expenditures, if unconstrained, would total approximately $21.1 million.  Pfeiffer Aff., ¶ 12.

This gap was narrowed by implementing revenue increases of approximately $2.0 million and expenditure reductions of approximately $4.3 million.  The FY 2011 revenue increase of $2.0 million was derived in part by reducing the motor vehicle excise tax exemption from $6,000 to $1,000, and by imposing a supplemental property tax levy of ten percent (10%).  The actual tax levy increase, including revenue gained from the motor vehicle excise tax and the supplemental property tax, totaled approximately nineteen percent (19%) for FY 2011.  Pfeiffer Aff., ¶ 13.  The $4.3 million in expenditure reductions were based on the following efforts:

>    a.    As a stop-gap measure, the City was required to continue its recent practice of not paying the actuarially-required contribution to the City's locally-administered pension plans through John Hancock Insurance Company for the fiscal year, totaling approximately $3.3 million; and

b.       Savings totaling approximately $950,000 in personnel costs due to the elimination of vacant positions, layoffs and reductions in salaries and benefits.

c.       Personnel cost reductions including reductions in medical benefit waiver bonuses from $5,000 to $1,000 for non-represented City employees, as well as increasing medical benefit co-shares for non-represented employees.

d.       Reductions resulting from temporary concessions after negotiations with three of the City's labor unions: RI Council 94, AFSCME, AFL-CIO Local 1627 ("Municipal Workers' Union"); Local 1485, International Association of Fire Fighters, AFL-CIO ("Fire Union"); and Fraternal Order of Police Lodge 2 ("Police Union").[2]

Pfeiffer Aff., ¶¶ 14-20.

Unfortunately these measures, many of which were temporary, were insufficient to restore the financial solvency of the City.  After the FY 2011 budget was passed, both of the receivers undertook additional efforts to reduce expenditures.  Pfeiffer Aff., ¶ 22; Flanders Aff., ¶¶ 3-4.  The City even unsuccessfully attempted to obtain a special State appropriation to close the budget gap for FY 2012.  Flanders Aff., ¶ 5.  Notwithstanding these efforts over the past year, the City's operating deficit remains, due in large part to labor costs and related unfunded pension liabilities, health insurance obligations and restrictions on City managerial control contained or provided for in the collective bargaining agreements.  *Id*; see also Corrigan Finances Aff., ¶ 15.

Based upon the City's FY 2012 Unbalanced Budget Cash Flow Analysis, the City will have a negative cash balance on or before August 31, 2011 and then again in each succeeding month for the remainder of the fiscal year, except for the month of October 2011. Corrigan Finances Aff. ¶ 17. *Exhibit C.*

The General Fund incurred a $2.3 million deficit during the FY 2010 which has been carried forward. Corrigan Finances Aff. ¶ 6.  The General Fund carried over a deficit during FY

---

[2] Reductions were not sought from the City's public school employee unions because the State was paying 100% of the City's public school operating costs.   The Receiver reserves all of his rights.

2011 which will be in excess of $2.3 million which must be carried forward to FY 2012. Corrigan Finances Aff. ¶ 7. The City's financial projections for FY 2012 estimate that the General Fund deficit could exceed $5.6 million. Corrigan Finances Aff. ¶ 22, *Exhibit B*. Projected expenditures are $22,036,396, which is based, in part, on the City's cost of labor for the service, compensation and pension benefit levels required under the current labor contracts. Projected revenues are $16,436,022.  Corrigan Finances Aff., *Exhibit B*.

The budget deficits have been the result of a decrease in the City's General Fund revenues, while General Fund expenditures, including the City's labor costs, have increased. Corrigan Finances Aff. ¶ 10.

**B.      The City's Attempts to Avoid Insolvency Included Cuts to Jobs, Services and Staff.**

Immediately upon his appointment and assuming of control over the City's finances, the Judge Pfeiffer, implemented revenue increases, costing cutting measures, and negotiated with the labor unions to obtain concessions.  Pfeiffer Aff., ¶¶ 13-18.

After the FY 2011 budget was balanced and adopted, the Receiver implemented additional measures during FY 2011 to reduce the City's expenses for the current year and thereafter.  These measures included the following:

a.      Eliminating certain vacant positions through attrition;

b.      Closely monitoring and restricting overtime;

c.      Closely monitoring and restricting discretionary expenditures;

d.      Shifting the salaried city solicitor position to a contract position without benefits;

e.      Reducing spending in the Recreation Department;

f.      Eliminating stipends for City Council members;

     g.     Pursuing mutual aid and opportunities for efficiencies and shared services with a neighboring community.

Pfeiffer Aff., ¶¶ 22, 32.  In addition, on November 3, 2010, $1.5 million of Tax Anticipation Notes ("TANs") were issued by the City to Navigant Credit Union ("Navigant").  Navigant was the only financial institution approached by the Receiver that was willing to purchase the TANS. Pfeiffer Aff., ¶ 28.

When Judge Flanders was appointed as the successor state receiver, he continued to pursue avenues for increased revenues and reduced expenditures.  These measures included:

     a.     Reducing operations of the Community Center and staff reductions including layoffs in March 2011;

     b.     Merging the Recreation Department and the Community Center, and further reducing staff at the Community Center in April 2011;

     c.     Shutting off certain City utilities to properties not in use;

     d.     Implementing a freeze on non-essential expenditures in April 2011;

     e.     Increasing permitting fees in June 2011, resulting in an additional estimated $30,000 per year in revenues;

     f.     Eliminating health benefits for the City's elected officials effective June 1, 2011, to save $55,653 per year;

     g.     Replacing the State Receiver's Council with a Hearing Officer and eliminating stipends, saving $5,880 per year;

     h.     Eliminating health benefits for part-time City employees effective July 1, 2011, to save $5,295 per year;

     i.     Eliminating the City Registrar position through attrition in June 2011, for savings of $90,000 per year;

     j.     Closing the Library and the Community Center effective July 1, 2011, resulting in $570,000 of savings per year;

     k.     Reducing hours of the City Recreation Director in July 2011, to save $20,568 per year;

     l.     Renegotiating life insurance premiums to be effective on July 1, 2011, saving $5,500 per year;

> m.    Declining to fill the City Fire Chief position in July 2011, for annualized savings of $84,121;
>
> n.    Replacing the city solicitor flat-fee contract position with an hourly solicitor in July 2011, for savings of $25,000 per year;
>
> o.    Reducing tax bill printing costs by $2,000 by omitting non-essential materials; and
>
> p.    Reducing Police Department operating and office supplies, resulting in savings of $2,500 per year.

Flanders Aff., ¶ 3.

In addition, Judge Flanders has continued discussions started by Judge Pfeiffer with the City of Pawtucket regarding shared services and also met with officials from the Town of Cumberland regarding shared services. Flanders Aff., ¶¶ 6, 11. In furtherance of this objective, on April 26, 2011, the Office of the Receiver and Pawtucket officials met with representatives of the Municipal Workers' Union to discuss the possibility of sharing Code Enforcement services. Flanders Aff., ¶ 8. The City's efforts to reduce expenses through shared services, restructuring, outsourcing and privatization are significantly restricted by the collective bargaining agreements with the Police Union, the Firefighters' Union and the Municipal Workers' Union. Corrigan Finances Aff. ¶¶ 27-29.

**C.    The Negotiations Between the City and Labor Unions Failed to Reach an Acceptable Plan of Viability.**

The City has collective bargaining agreements with the Police Union, the International Firefighters' Union, and the Municipal Workers' Union. Corrigan Labor Negotiations Aff., ¶ 3. The collective bargaining agreement between the City and the Police Union expires June 30, 2012; the collective bargaining agreement between the City and the Firefighters' Union expires on June 30, 2012; and the collective bargaining agreement between the City and Counsel 94 expired on June 30, 2011. Corrigan Labor Negotiations Aff., ¶ 4.

The City and the Municipal Workers' Union engaged in collective bargaining beginning in May 2011.  Negotiations continued past the expiration of the Municipal Workers' Union collective bargaining agreement.  In early July 2011, the City management bargaining team made it known to the Municipal Workers' Union that bankruptcy was a strong possibility and that unless, among other things, substantial changes were made to the existing collective bargaining agreement and the future pension benefits of active members, a bankruptcy would be inevitable. As part of those negotiations, the City management bargaining team presented to the Municipal Workers' Union a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of Chapter 9 became necessary.  The parties continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to develop a plan of adjustment, or parts thereof, which would be presented to the bankruptcy court. Corrigan Labor Negotiations Aff., ¶¶ 6-9.

The bargaining with the Municipal Workers' Union was undertaken in good faith.  The City management bargaining team was direct and open with the Municipal Workers' Union.  The union was respectful, cooperative and appeared to be bargaining in good faith as well. Notwithstanding the parties' efforts, the City and the Municipal Workers' Union were not able to reach an agreement.  Corrigan Labor Negotiations Aff., ¶¶ 10-11.

Due to the financial distress of the City, the Receiver asked the Police Union and the Firefighters' Union to engage in mid-term collective bargaining.  Both unions agreed to engage in such bargaining. In early July 2011, the City management bargaining team made it known to the Police Union that bankruptcy was a strong possibility and that unless, among other things, substantial changes were made to the existing collective bargaining agreement and the future pension benefits of active members, a bankruptcy would be inevitable. As part of those negotiations, the City management bargaining team presented to the Police Union a broad outline

which would be the basis of a plan of adjustment if the Receiver determined that the filing of a Chapter 9 proceeding became necessary.  The City and the Police Union continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to reach a plan of adjustment, or parts thereof, to be presented to the bankruptcy court.   Corrigan Labor Negotiations Aff., ¶¶ 12-15.

The bargaining with the Police Union was undertaken in good faith.   The City's bargaining team was direct and open with the Police Union.  The Police Union was respectful, cooperative and appeared to be bargaining in good faith as well.  The Police Union indicated on several occasions that they were concerned about reaching an agreement and then finding out that they would be asked for further concessions.  Corrigan Labor Negotiations Aff., ¶¶ 16-17

Concerning the Firefighters' Union, again in early July 2011, the City management bargaining team made it known that bankruptcy was a strong possibility and that unless, among other things, substantial changes were made to the existing collective bargaining agreement and the future pension benefits of active members, a bankruptcy would be inevitable.  As part of those negotiations, the City management bargaining team presented to the Firefighters' Union a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of  a Chapter 9 proceeding became necessary.  The City and the Firefighters' Union continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to develop a plan of adjustment, or parts thereof, to be presented to the bankruptcy court. Corrigan Labor Negotiations Aff., ¶¶ 18-20.

The bargaining with the Firefighters' Union was undertaken in good faith.  The City management bargaining team was direct and open with the Firefighters' Union.  The Firefighters' Union was respectful, cooperative and appeared to be bargaining in good faith as well.  The Firefighters' Union also indicated on several occasions that they were concerned

about reaching an agreement and then finding out that they would be asked for further concessions. Corrigan Labor Negotiations Aff., ¶¶ 21-22.

During negotiations, the City expressed to the Unions that it was attempting to standardize certain benefits and terms and conditions of employment.  The City management bargaining team also had confidential "off the record" conversations with certain of the unions where particular proposals were being discussed in an effort to reach agreements.  Corrigan Labor Negotiations Aff., ¶ 23.

Notwithstanding the parties' efforts, the City and the Unions were unable to reach collective bargaining agreements.  Corrigan Labor Negotiations Aff., ¶ 24.

**D.      Negotiations Between the City and Retirees Failed to Reach Concessions Regarding Pension and Health Benefits.**

Many factors have contributed to the current insolvency of the City and in particular to the insolvency of the City-run pension funds, including the failure of past administrations to appropriately fund the pension funds.  It is prudent practice for municipalities that manage their own employee pension plans not only to pay annual pension benefits currently owed to their retirees, but also to contribute additional amounts each year into the pension funds in order that funds accumulate so there will be sufficient funds available to pay future retirees' pension benefits.  When a municipality fails to make such investments, it creates what is often referred to as an "unfunded liability."   Professional actuaries typically estimate what that "unfunded liability" is, based on several factors, including but not limited to: (1) the age at which employees may retire; (2) the life expectancy of employees; (3) the amount of the pension benefits to be paid; and (4) a projection as to the investment return the municipality will earn on the invested funds.  In other words, an "unfunded liability" is the difference between the projected value of the amount a municipality projects that it will need to pay its retirees when they retire, and the

amount of money the municipality has available to pay its retirees. Flanders Aff., ¶ 13; *see also* Receiver's Report, pp. 41-52.

Unfortunately, the City historically often failed to make these annual investments into its City-run pension funds thereby resulting in very large unfunded liabilities. Flanders Aff., ¶¶ 14, 17-18; *see also* Receiver's Report, pp. 41-52.

There are three (3) pension plans for City employees. The employees and retirees of the Municipal Workers' Union participate in the Municipal Employees' Retirement System administered by the Employees' Retirement System of Rhode Island, commonly known as "MERS." Governor Lincoln D. Chafee and General Treasurer Gina Raimondo, the chair of the Retirement Board that oversees MERS, have convened a blue-ribbon committee, which has begun to meet and study changes that must be made to MERS in order to reduce or extinguish its unfunded liability. The City is waiting to see what changes will be made by the State to MERS and, while reserving the Receiver's right to make changes in the future, the City is not implementing changes to those pensions at this time. Flanders Aff., ¶ 16.

The members of the Police Union and the Firefighters' Union that were hired before July 1, 1972, participate in a City-run plan which required that employees contribute 1% of salary (closed to new hires) and is commonly known as "the 1% Plan." Based on actuarial projections (as of July 1, 2010), the 1% Plan had an unfunded liability of approximately $13,000,000, and according to the "City of Central Falls 1% Pension Plan: Actuarial Valuation Report July 1, 2010," prepared by Nyhart, the City's actuary, as of July 1, 2010, the plan was only 8.8% funded. Flanders Aff., ¶ 17, Exhibit C.

The members of the Police Union and Firefighters' Union that were hired after July 1, 1972, participate in a City-run plan administered by John Hancock Insurance Company which is commonly known as the "John Hancock Plan." Based on actuarial projections (as of July 1,

2010), the John Hancock Plan had an unfunded liability of approximately $33,600,000, and according the "City of Central Falls Pension Plan: Actuarial Valuation Report July 1, 2010," prepared by Nyhart, the City's actuary, as of July 1, 2010, the plan was only 16.2% funded. Flanders Aff., ¶ 18, Exhibit D.

In an attempt to reduce this enormous unfunded liability, the City engaged in a series of communications with the retirees regarding their pension and health benefits. On July 5, 2011, the Office of the Receiver sent letters to the retirees of the Central Falls police and fire departments outlining proposed reductions to pension and health insurance benefits a necessary component of a viable and feasible turnaround plan for the City.  Retirees were invited to a meeting to be held at Central Falls High School on July 19, 2011 and were invited to make alternative proposals that might prudently achieve the same necessary savings.  Flanders Aff., ¶ 20.

On July 13, 2011, the Office of the Receiver sent letters to retirees of the Central Falls police and fire departments detailing the proposed reductions to the health insurance benefits. Retirees were again notified of the meeting to be held on July 19, 2011, where representatives of Blue Cross/Blue Shield of RI would be present and explain the proposed changes and answer question regarding the heath insurance plans.  Retirees were also invited to make alternative proposals that might prudently achieve the same necessary savings.  Flanders Aff., ¶ 21.

On July 14, 2011, the Office of the Receiver sent letters to retirees participating in MERS who receive health insurance coverage from the City, detailing the proposed reductions to health insurance which is a necessary component of a viable and feasible turnaround plan for the City.  Retirees were invited to attend the July 19, 2011 meeting of police and fire retirees for the purpose of being present for the discussion regarding health insurance changes.  Retirees were

invited to make alternative proposals that might prudently achieve the same necessary savings. Flanders Aff., ¶ 22.

On July 19, 2011, a meeting was held with retirees and beneficiaries at Central Falls High School to discuss (i) proposed reductions to health insurance benefits, a necessary component of a viable and feasible turnaround plan for the City, and (ii) the formula proposed by the Receiver for calculating voluntary concessions from retirees and beneficiaries. Eighty-nine (89) retirees and beneficiaries attended the meeting in person and another twenty-four (24) retirees and beneficiaries attended the meeting through a conference call hook-up. Flanders Aff., ¶ 23.

At the July 19, 2011 meeting, retirees and beneficiaries were invited to make alternative proposals that might prudently achieve the same necessary savings. One of the retirees proposed to raise taxes on City residents, which the Receiver believed would be imprudent and might not be legal under State law. Central Falls residents are already being taxed at the maximum amount allowable under State law. A municipality may only exceed the property tax cap if it qualifies under the exemptions specified in Rhode Island Gen. Laws Section 44-5-2. It does not appear that Central Falls would have qualified to exceed the cap. It should be further noted that the City already raised taxes on Central Falls' residents by approximately 19.32% during FY 2011. As part of that tax increase, the City lowered the motor vehicle exemption from $6,000 in FY 2010 to $1,000 in FY 2011. This extraordinary increase in taxes has put a financial strain on many Central Falls families. As a result of last year's tax increases, the City's tax collection rates, most significantly, the motor vehicle excise tax collection rate, dropped significantly and contributed to leaving a gap in FY 2011 budgeted revenues. For these and other reasons, the Receiver determined that raising taxes beyond the levy cap again this year would not be a prudent and viable option. Flanders Aff., ¶ 24.

On July 21, 2011, the Office of the Receiver sent packets to police and fire retirees and beneficiaries with calculations of each individual's reduced pension benefits under the Receiver's proposal and requested return of enclosed ballots by 5:00 p.m. on July 28, 2011 approving or rejecting the proposed plan to reduce pension and health insurance benefits. The requested voluntary concessions would be one of several components of the plan of reductions in expenses necessary to affect a viable turnaround plan for the City. Retirees and beneficiaries were again invited to make alternative proposals that might prudently achieve the same necessary savings. Flanders Aff., ¶ 25. The Receiver did not receive any alternative proposals from retirees for changes to health insurance benefits and/or pension benefits that he believed would prudently achieve the same necessary savings. Flanders Aff., ¶ 26.

The ballots were sent to 143 retirees and beneficiaries and were due at 5:00 pm. on July 28, 2011, but two were determined to be deceased. As of 5:00 p.m. on July 28, 2011, the Office of the Receiver received 106 ballots from the retirees and beneficiaries. Only 12 retirees/beneficiaries voted to accept the voluntary concessions necessary to affect a viable and feasible turnaround plan for the City (10 of whom did not have their pension benefits reduced by the proposal and therefore their acceptances would create no savings to the City). Of the remaining 129 retirees/beneficiaries who were sent ballots, 37 voted to reject the proposal, 57 requested additional time to decide whether or not to accept or reject the proposal, and 35 did not respond. Flanders Aff., ¶ 27.

Based on the fact that only 2 of the 141 retirees agreed to reduce the amount of their pension benefits, on July 29, 2011, the Receiver determined that the only way to prudently return the City to viability would be through the filing of a Chapter 9 petition and confirmation of a prudent plan of debt adjustment. Flanders Aff., ¶ 28.

As demonstrated by the forgoing chronology, the City has exhausted all feasible and reasonable options and is forced to file its Chapter 9 petition to pursue a viable plan for financial stability and recovery.

### III.    LEGAL ANALYSIS

**THE CITY MEETS THE CRITERIA SET FORTH IN SECTION 109(c) AND IS AN ELIGIBLE DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE.**

A petitioner must meet certain criteria to be an "eligible" debtor under Chapter 9.  Under Bankruptcy Code § 109(c), a municipality is eligible for Chapter 9 relief if such entity:

(1)    is a municipality;

(2)    is specifically authorized, in its capacity as a municipality to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3)    is insolvent;

(4)    desires to affect a plan to adjust its debts; and

(5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan;

(C) is unable to negotiate with creditors because such negotiation would be impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a preference under § 547.

The criteria "are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies." *In re Valley Health Sys.*, 383 B.R. 156, 163 (Bankr. C.D. Cal. 2008). "The general policy of Chapter 9 is to give a debtor a breathing spell from debt collection efforts so that it can work out a repayment plan with creditors." *In re County of Ora*nge, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995).  It is the City's burden to establish eligibility under

Section 109(c). *Id* at 599 ("The burden of proving eligibility under § 109(c) is on the party filing the petition."). As will be discussed below, the City satisfies each of the § 109(c) criteria and is therefore "eligible" for Chapter 9 relief.

### A.     <u>The City is a Municipality</u>.

Section 109(c)(1) requires that the petitioner under Chapter 9 be a municipality.   11 U.S.C. § 109(c)(1). A municipality is defined under Section 101(40), which provides: "The term 'municipality' means political subdivision or public agency or instrumentality of a State."   11 U.S.C. § 101(40). The City is a political subdivision of the State of Rhode Island and is a municipality within the meaning of Section 109(c)(1). *See* Chapter 1421 of the Rhode Island Public Laws of 1895, "AN ACT TO ESTABLISH THE CITY OF CENTRAL FALLS;"  see also *Lynch v. King, 120 R.I. 868, 876-77, 391 A.2d 117, 122 (1978)*; R.I. Const. art. XIII, § 4.  The City includes all of its departments. *See Town of Johnston v. Santilli*, 892 A.2d 123, 129-30 (R.I. 2006).

**B.      A Receiver for a City is Expressly Authorized by Rhode Island
Statute to File a Petition Under Chapter 9.**

Section 109(c)(2) requires that a municipality be specifically authorized to be a Chapter 9

debtor under state law or by a governmental officer empowered by state law to authorize such

entity to be a Chapter 9 debtor.  11 U.S.C. § 109(c)(2).  The Fiscal Stability Act § 45-9-7(b)(3)

grants a receiver "[t]he power to file a petition in the name of the city or town under Chapter 9 of

Title 11 of the United States Code, and to act on the city's or town's behalf in any such

proceeding."  Accordingly, the Receiver is authorized to file the Chapter 9 petition on behalf of

the City.

**C.      The City is Insolvent.**

Section 109(c)(3) requires simply that the municipality be "insolvent."  11 U.S.C. §

109(c)(3).  Under § 101(32)(C), a municipality is "insolvent" if it is:

> (i) generally not paying its debts as they become due unless such debts are the subject of
> a bona fide dispute; or

> (ii) unable to pay its debts as they become due.

The City is insolvent because it is "unable to pay its debts as they become due."  11

U.S.C. § 101(32)(C)(ii).

Insolvency is determined by a prospective analysis using the date the petition is filed as

the reference point.  *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991).  While

mere proof of a budget deficit is insufficient, the debtor does not have to wait until it is actually

not paying its bills before it is "eligible" to file for Chapter 9 relief.  The court in *City of*

*Bridgeport* recognized that:

> Cities cannot go out of business.  Chapter 9 is intended to enable a financially distressed city to "continue to provide its residents with essential services such as police protection, fire protection, sewage and garbage removal, and schools . . .," while it works out a plan to adjust its debts and obligations.  A construction of 11 U.S.C. § 101(32)(C) under which a city would not be able to seek Chapter 9 protection unless and until it was actually not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-delivery of services.

*Id.* at 336-37.

Furthermore, in a more liberal view of insolvency, the United States Bankruptcy Court for the Southern District of New York held that having cash on hand did not render an entity solvent if it was still likely to run out of funds for operations within months.  *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 271-72 (Bankr. S.D.N.Y. 2010).  The *City of Bridgeport* court also held that in order to be "insolvent," a city must prove that it will be unable to pay its debts as they become due in its current fiscal year or, based on an adopted budget, in its next fiscal year.  129 B.R. at 338.  This is a cash flow, not a budgetary deficit, analysis.  *See In re Pierce County Hous. Auth.*, 414 B.R. 702, 711 (Bankr. W.D. Wash. 2009) (debtor was insolvent as it did not have a tangible reserve fund from which debts could be paid); *see also In re Mt. Carbon Metro. Dist.,* 242 B.R. 18, 32-33 (Bankr. D. Colo. 1999) (court applies "a functional rather than balance sheet approach").

The City will be unable to pay its debts as they become due on or before August 31, 2011.  As demonstrated in Corrigan Finances Affi. Exhibit B, if the City does not obtain the protections of Chapter 9, it will not be able to pay its debts as they become in September 2011, November 2011, December 2011, January 2012, February 2012, March  2012, April 2012, May 2012 and June 2012. Exhibit B, copied onto the following page, compares a projected FY 2012 Budget without changes authorized under Chapter 9 (under the column "Unbalanced"), against a projected FY 2012 Budget with changes authorized under Chapter 9 (under the column "Balanced").

| Item | Summary Central Falls FY2012 Budgets | | |
| | Adopted | | |
| | Unbalanced | Balanced | Variance |
|---|---|---|---|
| Tax Revenue | 12,136,255 | 12,136,255 | - |
| Non-Tax Revenue | 931,850 | 931,850 | - |
| State Revenue | 2,437,185 | 2,437,185 | - |
| Department Revenue | 301,050 | 188,550 | (112,500) |
| Other Revenue | 629,682 | 629,682 | - |
| Total Revenue | 16,436,022 | 16,323,522 | (112,500) |
| | | | |
| Mayor's Office | 27,989 | 27,989 | - |
| Receivers Council | 1,582 | 1,582 | - |
| City Clerk | 227,659 | 214,603 | (13,056) |
| HR/Benefits | 47,130 | 71,589 | 24,459 |
| Legal | 162,740 | 119,639 | (43,101) |
| Tax Assessor | 180,715 | 177,308 | (3,407) |
| Finance | 483,181 | 465,855 | (17,326) |
| Board of Canvassers | 35,230 | 35,230 | - |
| City Property | 669,392 | 525,620 | (143,772) |
| City Boards | 12,000 | 12,000 | - |
| Police | 5,237,174 | 3,155,915 | (2,081,259) |
| Fire | 5,367,715 | 3,258,545 | (2,109,170) |
| Probate Court | 7,868 | 7,868 | - |
| Municipal Court | 100,091 | 68,655 | (31,436) |
| Animal Control | 25,000 | 25,000 | - |
| Inspection Officers | 13,961 | 9,307 | (4,654) |
| Code Enforcement | 204,405 | 172,322 | (32,083) |
| Highway | 1,266,821 | 1,066,799 | (200,022) |
| Public Works | 371,420 | 344,531 | (26,889) |
| Library | 29,130 | 18,692 | (10,438) |
| Recreation | 65,585 | 39,964 | (25,621) |
| Planning & Community | 58,236 | 96,516 | 38,280 |
| Community Center | 6,819 | 6,819 | - |
| Munipal Debt | 2,656,630 | 2,611,775 | (44,855) |
| Contingencies | 526,000 | 526,000 | - |
| Employee Benefits | 2,927,572 | 2,270,183 | (657,389) |
| Police Retirement | 629,297 | 480,820 | (148,478) |
| Fire Retirement | 695,053 | 512,393 | (182,660) |
| Major Purchases | - | - | - |
| Total Expenditures | 22,036,396 | 16,323,522 | (5,712,874) |
| | | | |
| Surplus/(Deficit) | (5,600,374) | - | |

In the Unbalanced and the Balanced budgets, revenues are projected at $16.4 million and $16.3 million, respectfully.  However, in the Unbalanced budget, expenditures are projected at approximately $22 million as compared to the Balanced budget which projects expenditures at only $16.3 million.  The Unbalanced budget produces a deficit of approximately $5.6 million while the Balanced budget is balanced.

Similarly, Exhibits C and D to Corrigan Finances Aff., compare cash flow projections for FY 2012 without changes authorized under Chapter 9 against cash flow projections for FY 2012 Budget with changes authorized under Chapter 9.  These two charts are copied onto the following pages.

**Central Falls FY2012 Unbalanced Budget Cash Flow Projections**

| | FY12 Unbalanced | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-11 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 Sum 2 FY2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows** | | | 3 | 3 | 2 | | 2 | 2 | 2 | 3 | 3 | 2 | |
| Tax Revenue | 12,136,255 | 3,044,140 | 128,000 | 812,000 | 1,315,000 | 765,800 | 1,641,000 | 1,159,000 | 600,000 | 1,960,000 | 1,021,000 | 359,000 | 660,215 | 12,136,255 |
| Non-Tax Revenue | 931,850 | 77,695 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,655 | 931,850 |
| State Revenue | 2,437,185 | 249,460 | 177,133 | 7,482 | 855,676 | 31,047 | 7,482 | 7,482 | 153,568 | 860,976 | 31,047 | 7,482 | 2,437,185 |
| Departmental Revenue | 188,550 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 188,550 |
| Other Revenue | 629,682 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 629,682 |
| **Total Revenue** | 16,323,522 | 3,439,441 | 450,973 | 965,322 | 2,327,016 | 962,787 | 1,194,322 | 1,303,322 | 775,887 | 1,479,409 | 2,033,916 | 548,697 | 843,503 | 16,323,522 |
| | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | |
| Payroll, incl taxes | 6,522,813 | 482,966 | 499,333 | 707,343 | 495,139 | 495,139 | 507,651 | 514,878 | 514,878 | 736,650 | 514,878 | 514,878 | 522,413 | 6,505,046 |
| Benefits | 3,555,747 | 1,221,769 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 4,516,049 |
| JH Payments | 3,675,000 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 3,675,000 |
| 1% Pension (Payg0) | 1,324,350 | 100,000 | 109,000 | 109,000 | 109,000 | 109,000 | 109,000 | 111,725 | 111,725 | 111,725 | 111,725 | 111,725 | 111,725 | 1,324,350 |
| City Property | 219,658 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 219,658 |
| Legal & Professional | 378,000 | 39,667 | 44,667 | 44,667 | 27,167 | 27,167 | 27,167 | 37,167 | 27,167 | 27,167 | 27,167 | 27,167 | 27,167 | 374,133 |
| Insurance | 330,711 | 35,360 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 332,711 |
| Police Other | 345,000 | 96,421 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 412,671 |
| Fire Other | 183,000 | 26,776 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 16,000 | 15,000 | 191,776 |
| Admin Other | 392,692 | 40,269 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 400,226 |
| DPW Other | 189,500 | 11,213 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 184,221 |
| Public Works | 371,420 | 5,786 | 30,952 | 30,952 | 30,952 | 30,952 | 30,652 | 30,652 | 30,652 | 30,652 | 30,952 | 38,952 | 30,862 | 348,234 |
| Debt | 2,656,630 | 473,303 | 44,655 | | 175,125 | 203,010 | 162,303 | 162,303 | | | 785,126 | 813,010 | | 2,650,630 |
| Contingencies | 200,000 | | | | | | | | | | | 100,000 | | 200,000 |
| Unemployment | 82,150 | 8,658 | 16,000 | 16,000 | 16,000 | 16,000 | 8,500 | 8,500 | 100,000 | | | | | 82,158 |
| Compensated Absences | | 14,787 | 238,030 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | | 50,000 | | 50,000 | 50,000 | 544,787 |
| **Total Expenditures** | 20,459,671 | 2,950,372 | 1,719,178 | 1,707,333 | 1,602,765 | 1,675,140 | 1,432,941 | 1,664,795 | 1,534,093 | 1,705,166 | 2,216,218 | 2,397,703 | 1,458,557 | 21,966,350 |
| | | | | | | | | | | | | | | |
| Unpaid FY11 Expenditures | 374,992 | | | | | | | | | | | | | 600,992 |
| Beginning Balance | | 772,560 | 1,361,570 | (84,683) | (949,142) | (374,328) | (1,234,928) | (1,473,247) | (1,834,720) | (2,590,059) | (2,818,084) | (3,004,089) | (4,855,391) | |
| Total Revenues | 772,560 | 3,439,441 | 450,973 | 965,322 | 2,327,016 | 962,787 | 1,194,322 | 1,303,322 | 775,887 | 1,479,409 | 2,033,916 | 548,697 | 843,538 | |
| Total Expenditures | | (2,850,372) | (1,869,428) | (1,857,581) | (1,759,006) | (1,823,389) | (1,432,941) | (1,664,795) | (1,534,093) | (1,705,166) | (2,219,218) | (2,397,103) | (1,458,557) | |
| End Balance | | 1,361,570 | (84,683) | (949,142) | (374,328) | (1,234,928) | (1,473,247) | (1,834,720) | (2,591,926) | (2,818,084) | (3,004,089) | (4,856,391) | (6,470,320) | |

**Central Falls FY2012 Balanced Budget Cash Flow Projections**

| | FY12 Balanced | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Sum FY2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows** | | | | | | | | | | | | | | |
| Tax Revenue | 12,136,265 | 3,044,440 | 128,000 | 612,000 | 1,315,000 | 766,900 | 1,041,000 | 1,152,000 | 650,000 | 1,180,000 | 1,021,000 | 369,000 | 690,215 | 12,136,265 |
| Non-Tax Revenue | 931,890 | 77,655 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,655 | 931,890 |
| State Revenue | 2,437,185 | 249,460 | 177,133 | 806,970 | 327,856 | 31,647 | 7,482 | 7,482 | 31,047 | 153,598 | 666,978 | 310,047 | 7,482 | 2,437,185 |
| Department Revenue | 188,550 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 188,550 |
| Other Revenue | 629,882 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 629,882 |
| Total Revenue | 16,323,522 | 3,439,441 | 450,973 | 966,522 | 2,327,916 | 962,787 | 1,194,322 | 1,303,522 | 790,867 | 1,476,428 | 2,533,818 | 545,867 | 843,538 | 16,323,522 |
| | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | |
| Payroll, incl taxes | 3,810,000 | 482,666 | 425,590 | 623,918 | 462,042 | 367,524 | 367,524 | 219,476 | 219,476 | 310,647 | 218,279 | 218,279 | 218,279 | 4,073,595 |
| Benefits | 1,796,125 | 1,221,769 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 2,859,050 |
| 1H Payments (Phryp9) | 1,155,000 | | | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 962,500 |
| 1% Pension (Playg6) | 995,000 | 108,000 | 109,000 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 1,047,167 |
| City Property | 222,000 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 222,000 |
| Legal & Professional | 362,000 | 35,500 | 29,333 | 26,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 357,067 |
| Insurance | 290,000 | | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 290,000 |
| Police Other | 252,000 | 96,421 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 327,421 |
| Fire Other | 1,044,000 | 26,776 | 8,800 | 8,800 | 8,800 | 8,600 | 8,800 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 1,270,776 |
| Admin Other | 507,560 | 49,259 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 525,522 |
| DPW Other | 566,500 | 11,213 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 530,505 |
| Public Works | 344,550 | 6,766 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 321,603 |
| Debt | 2,656,630 | 473,303 | 64,856 | | 175,125 | 203,010 | | 162,203 | | | 813,010 | 785,125 | | 2,656,630 |
| Contingencies | 200,000 | | | | | | | | 100,000 | | | 100,000 | | 200,000 |
| Unemployment | 760,000 | 8,658 | 18,000 | 36,000 | | 45,000 | 45,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 789,668 |
| Compensated Absences | 472,500 | 14,787 | 8,000 | 17,500 | 20,000 | 20,000 | 20,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 471,287 |
| Total Expenditures | 15,433,865 | 2,544,317 | 977,124 | 1,229,279 | 1,100,028 | 1,190,896 | 987,986 | 1,222,409 | 1,470,207 | 1,121,325 | 1,614,132 | 1,942,017 | 1,000,007 | 16,081,680 |
| | | | | | | | | | | | | | | |
| Unpaid FY11 Expenditures | 374,992 | | | | | | | | | | | | | |
| Beginning Balance | 772,500 | 772,500 | 1,667,624 | 1,141,460 | 877,512 | 2,016,299 | 1,790,192 | 1,963,629 | 2,074,542 | 1,381,222 | 1,341,256 | 1,738,256 | 1,958,340 | 562,611 |
| Total Revenues | | 3,439,441 | 450,973 | 966,522 | 2,327,916 | 962,787 | 1,194,322 | 1,303,522 | 790,867 | 1,476,428 | 2,533,818 | 545,867 | 843,538 | (1,530,023) |
| Total Expenditures | | (2,544,317) | (977,124) | (1,229,279) | (1,100,028) | (1,190,895) | (897,986) | (1,222,207) | (1,470,207) | (1,121,325) | (1,614,132) | (1,942,017) | (1,000,007) | 406,342 |
| End Cash Balance | | 1,667,624 | 1,141,460 | 877,512 | 2,016,299 | 1,787,192 | 1,963,629 | 2,074,542 | 1,381,222 | 1,730,264 | 1,598,940 | 662,811 | | |

23

The "Central Falls FY 2012 Unbalanced Cash Flow Projections" (page 22) demonstrate that if no changes are made, the City will not be able to pay its debts as they become due in September 2011, November 2011, December 2011, January 2012, February 2012, March 2012, April 2012, May 2012 and June 2012. However, the "Central Falls FY 2012 Balanced Cash Flow Projections" (page 23) demonstrate that if the City makes authorized under Chapter 9, the City will be able to pay its debts as they come due throughout FY 2012.

### D.    The City Desires to Affect A Plan to Adjust Its Debts.

Section 109(c)(4) requires that the petitioner under Chapter 9 desire to affect a plan to adjust its debts. 11 U.S.C. § 109(c)(4). The City, by and through the Receiver, has certified in the Statement of Qualifications Under Section 109(c) that it desires to affect a plan to adjust its debts. *See also* Flanders Aff., ¶ 28. In his affidavit, Judge Flanders states: "Based on the overwhelming rejection of the voluntary concessions by the retirees and beneficiaries, on July 31, 2011, I determined that the only way to prudently return the City to viability would be through the filing of a Chapter 9 petition and confirmation of a prudent plan of debt adjustment and I hereby declare my desire to do so in order to fulfill my statutory duties under the Fiscal Stability Act." Flanders Aff. ¶ 28.

### E.    The City Has Satisfied the Negotiation Requirement Under Section 109(c)(5).

Generally, Section 109(c)(5) requires that a Chapter 9 petitioner demonstrate that it has satisfied or is excused from certain pre-petition negotiations with creditors. See 11 U.S.C. § 109(c)(5)*; Valley Health Sys.*, 383 B.R. at 161 (the purpose of Section 109(c)(5) is to promote prepetition negotiations between debtor and creditors). In order to be "eligible" for Chapter 9 relief, the debtor has the burden of demonstrating satisfaction of one of the following four (4) criteria:

(A) [it] has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) [it] has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) [it] is unable to negotiate with creditors because such negotiation is impracticable; or

(D) [it] reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § (c)(5).

The City has satisfied the requirement to negotiate in good faith but has failed to obtain the agreement of creditors holding a majority in amount of claims to be impaired.  11 U.S.C. § (c)(5)(B).  The City has engaged the Police Union, the Firefighters' Union and the Municipal Workers' Union in negotiations in good faith, but the parties have been unable to reach an agreement.

In *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), the bankruptcy court held that the debtor had satisfied the good faith negotiation test because of pre-petition offers to settle with the creditor whose debt gave rise to the debtor's financial difficulties.  *Id.* at *5-6.  As set forth in the Corrigan Labor Negotiation Aff. and in Section II(C) above, the City made significant efforts to negotiate with labor unions.  Labor costs are indisputably the largest single expenditure in the City budget and the source of the overwhelming unfunded pension debt the City faces.

"[W]hile a complete plan is not required, some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary.*"  In re City of Vallejo*, 408 B.R. 280, 297 (B.A.P. 9th Cir. 2008).  In the present case, the Police Union, the Firefighters' Union and the Municipal Workers' Union were each presented with a broad outline which would be the

basis of a plan of adjustment if the Receiver determined that the filing of a petition under Chapter 9 became necessary.  Corrigan Labor Negotiations Aff., ¶¶ 8, 14,19.

As demonstrated in the Flanders Aff. and in Section II(D) above, the Receiver negotiated in good faith to seek voluntary concessions from retirees or to seek an alternative plan from retirees to save the amount necessary to affect a plan of recovery.   However, only 2 of the Central Falls 141 retirees agreed to reduce their benefits.

Furthermore, the City satisfies the requirement that it is unable to negotiate with creditors because such negotiation is "impracticable."   11 U.S.C. § 109(c)(5)(C).   "'Impracticable' means 'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.'  In the legal context, 'impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.'"   *City of Vallejo*, 408 B.R. at 298 (citing *Valley Health Sys.,* 383 B.R. at 163).

"Whether negotiations with creditors is impracticable depends upon the circumstances of the case." *Pierce County*, 414 B.R. at 713 (citing *Vallejo,* 408 B.R. at 298).  Impractability often occurs when the debtor will have great difficulty negotiating with all of its creditors.  *New York City*, 427 B.R. at 276 (citing, inter alia, *Pierce County*, 414 B.R. at 713)  Impracticability also includes certain situations where assets would be at risk if time is taken to negotiate with creditors.  *Id.* (citing, inter alia, *Valley Health Sys*., 383 B.R. at 163).

In the present case, there are numerous unsecured creditors, including over 150 trade creditors nationwide.  Negotiations with each would be fruitless in light of the failure of the labor unions as well as the retirees and the City to reach agreement.  This is so because labor costs and related health and pension benefits represent the bulk of the City's expenses and without reductions, no projected plan would be viable.  Furthermore, as the Receiver had determined that

there were no set of circumstances under which the City could return to viability without significant voluntary concession from the retirees, and only 2 of Central Falls' 141 retirees agreed to voluntarily reduce their benefits, the Receiver determined that it would be impracticable and bad faith for the Receiver to commence negotiations with trade creditors. Flanders Aff., ¶ 30

## IV.    CONCLUSION

The City did everything reasonable and feasible that it could to avoid filing a petition under Chapter 9. It drastically cut services. It raised taxes to the maximum allowable. It attempted, without success, to negotiate voluntary concessions from the retirees and the unions that would allow the City to return to fiscal viability. It even requested a bailout from the State which may have set a precedent that the State might not have been able to afford. The City finally reached the fork in the road and had to make a choice. In one direction lay Pritchard, Alabama, where that city has defaulted on its obligations and simply stopped making pension payments to its retirees. In the other direction lay Chapter 9, and the realistic hope of restructuring the City's finances and re-making Central Falls in a relatively short period of time into one of Rhode Island's viable financial communities. It prudently chose to go down the road to Chapter 9. It is "eligible" to do so.

If Congress did not have cities such as Central Falls in mind when it drafted Chapter 9, the what did it have in mind?

For the reasons set forth above, the City meets the eligibility requirements to be a debtor under Section 109(c) of the Bankruptcy Code.

**ROBERT G. FLANDERS, JR.,** in his capacity as
Receiver of Central Falls,
By his attorney,


/s/ Theodore Orson
Theodore Orson, Esq. (No. 3874)
Orson and Brusini Ltd.
325 Angell Street
Providence, RI 02906
(401) 861-0344
torson@orsonandbrusini.com

Dated:  August 1, 2011


CERTIFICATE OF SERVICE

    I hereby certify that on August 1, 2011, I electronically filed the within with the Clerk of
the Bankruptcy Court for the District of Rhode Island Using the CM/ECF System. The following
participants have received notice electronically:

Gary L. Donahue ustpregion01.pr.ecf@usdoj.gov


/s/ Theodore Orson, Esq.