UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

In re CITY OF CENTRAL FALLS,    )
    RHODE ISLAND    )       Case No. 11-13105
    )
    )
Debtor    )       Chapter 9

### DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO APPROVE REJECTION OF THREE (3) COLLECTIVE BARGAINING AGREEMENTS

The City of Central Falls, Rhode Island (the "City"), the debtor in the above-captioned case, by and through its state-appointed receiver, Robert G. Flanders, Jr., hereby submits this memorandum of law in support of its Motion to Approve Rejection of Three (3) Collective Bargaining Agreements. The City also relies on and incorporates herein by reference the Affidavit of Mark A. Pfeiffer, annexed hereto as **Exhibit A** ("Pfeiffer Aff."), the Affidavit of Robert G. Flanders, Jr. ("Flanders Aff."), annexed hereto as **Exhibit B**, the Affidavit of Gayle A. Corrigan Regarding Labor Negotiations, annexed hereto as **Exhibit C** ("Corrigan Labor Negotiations Aff."), and the Affidavit of Gayle A. Corrigan with Respect to the City's Finances, annexed hereto as **Exhibit D** ("Corrigan Finances Aff.").

## I. INTRODUCTION

In this Chapter 9 case, the City seeks to develop and implement a plan of debt adjustment that will return the City to solvency and viability. To do so, the City must modify its debts and obligations so that they do not exceed the City's projected revenues. The Motion is a critical step toward achieving that objective.

The City's financial difficulties are extraordinarily severe. Without making changes authorized under Chapter 9, the City projects a deficit in Fiscal Year ending June 30, 2012 ("FY

2012") in the amount of approximately $5.6 million based on projected revenues of $16,436,022

and projected expenses of $22,036,396.  *See Exhibit B* to the Corrigan Finances Aff.  The City

projects that its general fund (the "General Fund") will be depleted by the end of August 2011

and then again in September 2011, November 2011, December 2011, January 2012, February

2012, March 2012, April 2012, May 2012, and June 2012.  *See Exhibit C* to Corrigan Finances

Aff.

In order to achieve a viable plan to adjust and restructure the City's debt obligations, the

City must reject its collective bargaining agreements with:   (1) the Central Falls Police

Department, Fraternal Order of Police, Central Falls Lodge No. 2 (the "Police Union"); (2) the

International Association of Fire Fighters, Local 1485, AFL-CIO (the "Firefighters' Union");

and (3) Rhode Island Council 94, American Federation of State, County and Municipal

Employees AFL-CIO, Local 1627 (the "Municipal Workers' Union") (collectively, the

"Unions").

Simply stated, the City cannot restore balance to its budget unless it restructures its labor

costs as a critical element of any plan of debt adjustment.   In FY 2012, the largest City

expenditure is the cost of labor, and the largest portion of the City's labor costs is paid to union

employees.[1]

The City's labor costs are mostly controlled by three collective bargaining agreements:

the Collective Bargaining Agreements with (1) the Police Union which expires on June 30, 2012,

(2) the Firefighters' Union which also expires on June 30, 2012, and (3) the Municipal Workers'

---

[1] The School Department is part of the City, even though in Fiscal Year 2012, 100% of the operating costs for the City's School Department will be paid by the State of Rhode Island.  *See E. Providence Sch. Comm. v. Smith*, 896 A.2d 49, 53 (R.I. 2006); *Town of Johnston v. Santilli*, 892 A.2d 123, 129-31 (R.I. 2006); *Cummings v. Godin*, 119 R.I. 325, 331, 377 A.2d 1071, 1074 (1977); *see also* City of Central Falls Charter of 1952, art. IV, ch. 14 (identifying school department as department of the City).  In Fiscal Year 2013, however, Central Falls will resume responsibility for some of the funding of its schools.  *See* Education Equity and Property Tax Relief Act, 2010 R.I. Pub. L. ch. 125 (codified at R.I. Gen. Laws §§ 16-7.2-1, et seq.).

Union which expired on June 30, 2011 (hereinafter, each a "CBA" and together "CBAs").  The City seeks to immediately reject each of these CBAs within this Chapter 9 bankruptcy case.[2]

Despite good faith efforts prior to this case, including multiple negotiating sessions, the City and the Unions could not agree on modifications to the CBAs that would create the savings necessary to return the City to financial stability.  See Corrigan Labor Negotiations Aff., ¶ 24.

Prior to filing its Chapter 9 petition, the City reduced expenditures other than labor costs. These changes included closely monitoring and restricting overtime, closely monitoring and restricting discretionary expenditures, shifting the salaried city solicitor position to a contract position without benefits, reducing spending in the Recreation Department, eliminating stipends for City Council members; pursuing mutual aid and opportunities for efficiencies and shared services with a neighboring community, merging the Recreation Department and the Community Center, shutting off certain City utilities to properties not in use; implementing a freeze on non-essential expenditures in April 2011, eliminating health benefits for the City's elected officials, replacing the State Receiver's Council with a Hearing Officer and eliminating stipends, eliminating health benefits for part-time City employees, closing the Central Falls Public Library, and closing the Community Center, among others.  Pfeiffer Aff., ¶ 22; Flanders Aff. ¶ 3.

In addition, prior to filing this petition, the City raised revenues by, among other things, raising taxes on Central Falls' residents by 19.32% during FY 2011.  As part of that tax increase, the City lowered the motor vehicle exemption from $6,000 in the Fiscal Year ended June 30,

---

[2] The City also has collective bargaining agreements with public school employees but, at this time, the City is not exercising any of its special Chapter 9 powers relative to those contracts.  It reserves all of its rights.

2010 ("FY 2010") to $1,000 in the Fiscal Year ended June 30, 2011 ("FY 2011").[3]  Pfeiffer Aff.,

¶ 19.

A plan of debt adjustment that only addresses the City's other debts and obligations, but

not the CBAs, cannot return the City to short-term solvency, much less long-term financial

stability.  In short, the City cannot correct the fundamental economic imbalance and emerge from

bankruptcy without restructuring its labor costs in a manner that requires CBA rejection.

By this Motion, the City is taking a necessary step toward restructuring its labor costs and

developing a viable plan of debt adjustment.  The City's rejection of the CBAs is appropriate,

and should be approved by the Court under the clearly-delineated standards in *NLRB v. Bildisco*

*& Bildisco*, 465 U.S. 513 (1984) ("*Bildisco*").

## II.      FACTUAL BACKGROUND

### A.      The City's Deficit and Unfunded Obligations.

The chronology of events leading up to the City's current fiscal crisis is extensively

detailed in the Receiver's Report, annexed as Exhibit D to Pfeiffer Aff.

On July 19, 2010, the state-appointed receiver, retired Superior Court Associate Justice

Mark A. Pfeiffer, assumed control of the City's affairs.  At that time, the City was approximately

three (3) weeks into FY 2011.  A budget for FY 2011 had not been established, and the actual

extent of the FY 2010 deficit remained unknown.  Pfeiffer Aff.,  ¶ 10.

Once the FY 2010 closing balance was estimated in August 2010, the Receiver focused

on developing the City's FY 2011 budget.  Using the FY 2010 adopted budget and the Fiscal

Year ending June 30, 2009 and FY 2010 actual expenditures as a basis, a baseline budget was

---

[3] This extraordinary increase in taxes has put a financial strain on many Central Falls' families.  As a result of last year's tax increases, the City's collection rates, most significantly the motor vehicles collection rate, dropped significantly and contributed to leaving a gap in FY 2011 budgeted revenues.  Flanders Aff., ¶ 25.

developed that revealed a structural budget deficit of approximately $6.3 million.  Total revenues

for FY 2011 were estimated at approximately $14.8 million, and expenditures, if unconstrained,

would total approximately $21.1 million.  Pfeiffer Aff., ¶ 12.

This gap was narrowed by implementing revenue increases of approximately $2.0 million

and expenditure reductions of approximately $4.3 million.  The FY 2011 revenue increase of

$2.0 million was derived in part by reducing the motor vehicle excise tax exemption from $6,000

to $1,000, and by imposing a supplemental property tax levy of ten percent (10%).  The actual

tax levy increase, including revenue gained from the motor vehicle excise tax and the

supplemental property tax, totaled approximately nineteen percent (19%) for FY 2011.  Pfeiffer

Aff., ¶ 13.  The $4.3 million in expenditure reductions were based on the following efforts:

> a.      As a stop-gap measure, the City was required to continue the City's recent
> practice of not paying the actuarially required contribution to the City's locally-
> administered pension plan through John Hancock Insurance Company for the fiscal year,
> totaling approximately $3.3 million; and
>
> b.      Savings totaling approximately $950,000 in personnel costs due to the
> elimination of vacant positions, layoffs and reductions in salaries and benefits.
>
> c.      Personnel cost reductions including reductions in medical benefit waiver
> bonuses from $5,000 to $1,000 for non-represented City employees, as well as increasing
> medical benefit co-shares for non-represented employees.
>
> d.      Reductions resulting from temporary concessions after negotiations with
> the Municipal Workers' Union, Firefighters' Union; and the Police Union.

Pfeiffer Aff., ¶¶ 14-20.

Unfortunately these measures, many of which were temporary, were insufficient to

restore the City to financial solvency.  After the FY 2011 budget was passed, both receivers

undertook additional efforts to reduce expenditures.  Pfeiffer Aff., ¶ 22; Flanders Aff., ¶¶ 3-4.

The City even attempted to obtain a special State appropriation to close the budget gap for FY

2012, which was rejected.  Flanders Aff., ¶ 5.  Notwithstanding these efforts over the past year,

the City's operating deficit remains, due in large part to labor costs, unfunded pension liabilities and health insurance obligations, and restrictions on the City's managerial control under the terms of the CBAs.  *Id*; *see also* Corrigan Finances Aff., ¶ 15.

Based upon the City's FY 2012 Unbalanced Budget Cash Flow Analysis, the City will have a negative cash balance on or before August 31, 2011 and will not be able to pay its debts as they become due in September 2011, November 2011, December 2011, January 2012, February 2012, March  2012, April 2012, May 2012 and June 2012.  Corrigan Finances Aff. ¶ 17.  *Exhibit C*.

The General Fund incurred a $2.3 million deficit during FY 2010 which has been carried forward. Corrigan Finances Aff. ¶ 6.  The General Fund carried over a deficit during FY 2011 which will be in excess of $2.3 million which must be carried forward to FY 2012.  Corrigan Finances Aff., ¶ 7. The City's financial projections for FY 2012 estimate that the General Fund deficit could exceed $5.6 million. Corrigan Finances Aff., ¶ 22, *Exhibit B*.  Projected expenditures are $22,036,396, which is based on the City's cost of labor for the service, compensation and pension benefit levels required under the current labor contracts.  Projected revenues are $16,436,022.  *Exhibit B*.

The budget deficits have been the result of, among other factors, a decrease in the City's General Fund revenues, while General Fund expenditures, in particular, the City's labor costs, have increased. Corrigan Finances Aff., ¶ 10.

**B.     The City's Attempts to Avoid Insolvency Included Cuts to Jobs, Services and Staff.**

Immediately upon his appointment and assuming of control over the City's finances, Judge Pfeiffer implemented revenue increases, costing cutting measures, and negotiated with the labor unions to obtain concessions.  Pfeiffer Aff., ¶¶ 13-18.

After the FY 2011 budget was balanced and adopted, the Receiver implemented additional measures during FY 2011 to reduce the City's expenditures for the current year and thereafter.  These measures included the following:

     a.     Eliminating certain vacant positions through attrition;

     b.     Closely monitoring and restricting overtime;

     c.     Closely monitoring and restricting discretionary expenditures;

     d.     Shifting the salaried city solicitor position to a contract position without benefits;

     e.     Reducing spending in the Recreation Department;

     f.     Eliminating stipends for City Council members; and

     g.     Pursuing mutual aid and opportunities for efficiencies and shared services with a neighboring community.

Pfeiffer Aff., ¶¶ 22, 32.

On November 3, 2010, $1.5 million of Tax Anticipation Notes ("TANs") were issued by the City to Navigant Credit Union ("Navigant").  <u>Navigant was the only financial institution approached by the Receiver that was willing to purchase the TANs</u>.  Pfeiffer Aff., ¶ 28.

When former Rhode Island Supreme Court Justice Robert G. Flanders, Jr. was appointed as the successor state receiver, he continued to pursue avenues for increased revenues and reduced expenditures.  These measures included:

     a.     Reducing operations of the Community Center and staff reductions including layoffs in March 2011;

     b.     Merging the Recreation Department and the Community Center, and further reducing staff at the Community Center in April 2011;

     c.     Shutting off certain City utilities to properties not in use;

     d.     Implementing a freeze on non-essential expenditures in April 2011;

e.       Increasing permitting fees in June 2011, resulting in an additional estimated $30,000 per year in revenues;

f.       Eliminating health benefits for the City's elected officials effective June 1, 2011, to save $55,653 per year;

g.       Replacing the State Receiver's Council with a Hearing Officer and eliminating stipends, saving $5,880 per year;

h.       Eliminating health benefits for part-time City employees effective July 1, 2011, to save $5,295 per year;

i.       Eliminating the City Registrar position through attrition in June 2011, for savings of $90,000 per year;

j.       Closing the Library and the Community Center effective July 1, 2011, resulting in $570,000 of savings per year;

k.       Reducing hours of the City Recreation Director in July 2011, to save $20,568 per year;

l.       Renegotiating life insurance premiums to be effective on July 1, 2011, saving $5,500 per year;

m.       Declining to fill the City Fire Chief position in July 2011, for annualized savings of $84,121;

n.       Replacing the city solicitor flat-fee contract position with an hourly solicitor in July 2011, for savings of $25,000 per year;

o.       Reducing tax bill printing costs by $2,000 by omitting non-essential materials; and

p.       Reducing Police Department operating and office supplies, resulting in savings of $2,500 per year.

Flanders Aff., ¶ 3.

Judge Flanders has continued discussions that were started by Judge Pfeiffer with the City of Pawtucket regarding shared services, and has also met with officials from the Town of Cumberland regarding shared services. Flanders Aff., ¶¶ 6, 11. However, the City's efforts to reduce expenses through shared services, restructuring, outsourcing and privatization are significantly restricted by the CBAs. Corrigan Finances Aff. ¶¶ 27-29.

**C.      Negotiations Between the City and Labor Unions Fail to Reach Modifications to CBAs Necessary to Affect a Plan of Viability.**

The City and Municipal Workers' Union engaged in collective bargaining beginning in May 2011.  Negotiations continued past the expiration of the Municipal Workers' Union CBA. In early July 2011, the City's management bargaining team made it known to the Municipal Workers' Union that bankruptcy was a strong possibility and that unless substantial changes were made to the existing CBA and the future pension benefits of active members, a bankruptcy would be inevitable. As part of the negotiations, the City's management bargaining team presented to the Municipal Workers' Union a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of Chapter 9 became necessary.  The parties continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to develop a plan of adjustment, or parts thereof, which would be presented to the Bankruptcy Court.  Corrigan Labor Negotiations Aff., ¶¶ 6-9

The bargaining with the Municipal Workers' Union was undertaken in good faith.  The City's management bargaining team was direct and open with the Municipal Workers' Union. The union was respectful, cooperative and appeared to be bargaining in good faith as well. Notwithstanding the parties' efforts, the City and the Municipal Workers' Union were not able to reach an agreement.  Corrigan Labor Negotiations Aff., ¶¶ 10, 11

Due to the financial distress of the City, the Receiver asked the Police Union and the Firefighters' Union to engage in mid-term collective bargaining.  Both unions agreed to engage in such bargaining. In early July 2011, the City's management bargaining team made it known to the Police Union that bankruptcy was a strong possibility and that unless, among other things, substantial changes were made to the existing CBA and the future pension benefits of active members, a bankruptcy would be inevitable. As part of those negotiations, the City's

management bargaining team presented to the Police Union a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of Chapter 9 became necessary.   The City and the Police Union continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to reach a plan of adjustment, or parts thereof, to be presented to the Bankruptcy Court.   Corrigan Labor Negotiations Aff., ¶¶ 12-15

The bargaining with the Police Union was undertaken in good faith.   The City's bargaining team was direct and open with the Police Union.   The Police Union was respectful, cooperative and appeared to be bargaining in good faith as well.   The Police Union indicated on several occasions that they were concerned about reaching an agreement and then finding out that they would be asked for further concessions.   Corrigan Labor Negotiations Aff., ¶¶ 16-17.

Concerning the Firefighters' Union, in early July 2011, the City's management bargaining team made it known that bankruptcy was a strong possibility and that unless, among other things, substantial changes were made to the existing CBA and the future pension benefits of active members, a bankruptcy would be inevitable.   As part of those negotiations, the City's management bargaining team presented to the Firefighters' Union a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of Chapter 9 became necessary.   The City and the Firefighters' Union continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to develop a plan of adjustment, or parts thereof, to be presented to the Bankruptcy Court.   Corrigan Labor Negotiations Aff., ¶¶ 18-20.

The bargaining with the Firefighters' Union was undertaken in good faith.   The City's management bargaining team was direct and open with the Firefighters' Union.   The Firefighters' Union was respectful, cooperative and appeared to be bargaining in good faith as

well.   The Firefighters' Union also indicated on several occasions that they were concerned about reaching an agreement and then finding out that they would be asked for further concessions. Corrigan Labor Negotiations Aff., ¶¶ 21-22

During negotiations, the City expressed to each of the Unions that it was attempting to unify certain benefits and terms and conditions of employment.   The City's management bargaining team also had confidential "off the record" conversations with certain unions where particular proposals were discussed in an effort to reach agreements.   Corrigan Labor Negotiations Aff., ¶ 23.

Notwithstanding the parties' efforts, the City and the Unions were unable to reach agreement on new collective bargaining agreements.  Corrigan Labor Negotiations Aff., ¶ 24.

D.    **Negotiations Between the City and Retirees Fail to Reach Voluntary Concessions Regarding Pension and Health Benefits**.

There are three (3) pension plans for City employees. The employees and retirees of the Municipal Workers' Union participate in the Municipal Employees' Retirement System run by the Employees' Retirement System of Rhode Island, commonly known as "MERS."  Governor Lincoln D. Chafee and General Treasurer Gina Raimondo, who chairs the Retirement Board that administers MERS, have convened a blue-ribbon committee to study changes that must be made to MERS in order to reduce or extinguish its unfunded liability.  The City is waiting to see what changes will be made by the State to MERS and, while reserving the Receiver's right to make changes in the future, the City is not implementing changes to those pensions at this time. Flanders Aff., ¶ 16.

The members of the Police Union and the Firefighters' Union that were hired before July 1, 1972, participate in a City-run plan which required that employees contribute 1% of salary (closed to new hires) and is commonly known as "the 1% Plan."  Based on actuarial projections

(as of July 1, 2010), the 1% Plan had an unfunded liability of approximately $13,000,000, and according to the "City of Central Falls 1% Pension Plan: Actuarial Valuation Report July 1, 2010," prepared by Nyhart, the City's actuary, the plan was only 8.8% funded.  Flanders Aff., ¶ 17, Exhibit C.

The members of the Police Union and Firefighters' Union that were hired after July 1, 1972, participate in a City-run plan administered by John Hancock Insurance Company which is commonly known as the "John Hancock Plan."  Based on actuarial projections (as of July 1, 2010), the John Hancock Plan had an unfunded liability of approximately $33,600,000, and according the "City of Central Falls Pension Plan: Actuarial Valuation Report July 1, 2010," prepared by Nyhart, the City's actuary, the plan was only 16.2% funded.  Flanders Aff., ¶ 18, Exhibit D.

In an attempt to limit this enormous unfunded liability, the City engaged in a series of communications with the retirees regarding their pension and health benefits. On July 5, 2011, the Office of the Receiver sent letters to the retirees of the Central Falls police department and fire department outlining proposed reductions to pension and health insurance benefits necessary to affect a viable and feasible turnaround plan for the City.  Retirees were invited to a meeting to be held at Central Falls High School on July 19, 2011.  Retirees were also invited to make alternative proposals that might prudently achieve the same necessary savings.  Flanders Aff., ¶ 20.

On July 13, 2011, the Office of the Receiver sent letters to retirees of the Central Falls police department and fire department detailing proposed reductions to health insurance benefits necessary to affect a viable and feasible turnaround plan for the City.  Retirees were again notified of the meeting to be held on July 19, 2011, where representatives of Blue Cross/Blue

Shield of RI would present and explain the proposed changes to the heath insurance plan and answer questions. Retirees were also invited to make alternative proposals that might prudently achieve the same necessary savings. Flanders Aff., ¶ 21.

The City's unfunded actuarial accrued liability for its other post-employment benefits, including health insurance, was calculated at $32,011,503 as of July 1, 2010. Receiver's Report at p. 51, Pfeiffer Affidavit, Exhibit D.

On July 14, 2011, the Office of the Receiver sent letters to retirees participating in MERS who receive health insurance coverage from the City, detailing the proposed reductions to health insurance benefits necessary to affect a viable and feasible turnaround plan for the City. Retirees were invited to attend the July 19, 2011, meeting of police and fire retirees for the purpose of being present for the discussion regarding health insurance changes. Retirees were invited to make alternative proposals that might prudently achieve the same necessary savings. Flanders Aff., ¶ 22.

On July 19, 2011, a meeting was held with retirees and beneficiaries at Central Falls High School to discuss (i) proposed reductions to health insurance benefits necessary to effect a viable and feasible turnaround plan for the City, and (ii) the formula proposed by the Receiver for calculating voluntary concessions from retirees and beneficiaries necessary to effect a viable and feasible turnaround plan for the City. Eighty-nine (89) retirees and beneficiaries attended the meeting in person and another twenty-four (24) retirees and beneficiaries attended the meeting through a conference call hook-up. Flanders Aff., ¶ 23.

At the July 19, 2011 meeting, retirees and beneficiaries were invited to make alternative proposals that might prudently achieve the same necessary savings. One of the retirees proposed to raise taxes on City residents, which the Receiver believed would not be prudent and might not

be legal.  Central Falls residents are already being taxed at the maximum amount allowable under state law.  A municipality may only exceed the property tax cap if it qualifies under the exemptions specified in Rhode Island Gen. Laws Section 44-5-2.  It does not appear that Central Falls would have qualified to exceed the cap.  It should be further noted that the City already raised taxes on Central Falls' residents by approximately 19.32% during FY 2011.  As part of that tax increase, the City lowered the motor vehicle exemption from $6,000 in FY 2010 to $1,000 in FY 2011. This extraordinary increase in taxes has put a financial strain on many Central Falls families.  As a result of last year's tax increases, the City's tax collection rates, most significantly the motor vehicle excise tax collection rate, dropped significantly and contributed to leaving a gap in FY 2011 budgeted revenues.  For these and other reasons, the Receiver determined that raising taxes beyond the levy cap again this year would not be a prudent and viable option.  Flanders Aff., ¶ 24.

On July 21, 2011, the Office of the Receiver sent packets to police and fire retirees and beneficiaries with calculations of each individual's reduced pension benefits under the Receiver's proposal and requested return of enclosed ballots by 5:00 p.m. on July 28, 2011 either approving or rejecting the proposed plan to reduce pension and health insurance benefits.  The requested voluntary concessions would be one of several components of the plan of reductions in expenses necessary to affect a viable turnaround plan for the City.  Retirees and beneficiaries were again invited to make alternative proposals that might prudently achieve the same necessary savings.  Flanders Aff., ¶ 26.  The Receiver did not receive any alternative proposals from retirees for changes to health insurance benefits and/or pension benefits that he believed would prudently achieve the same necessary savings.  Flanders Aff., ¶ 26.

The ballots were sent to 143 retirees and beneficiaries and were due at 5:00 pm. on July 28, 2011, but two were determined to be deceased.  As of 5:00 p.m. on July 28, 2011, the Office of the Receiver received 106 ballots back from the retirees and beneficiaries.   Only 12 retirees/beneficiaries voted to accept the voluntary concessions necessary to affect a viable and feasible turnaround plan for the City (10 of whom did not have their pension benefits reduced by the proposal and therefore would create no savings to the City).  Of the remaining 129 retirees and beneficiaries who were sent ballots, 37 voted to reject the proposal, 57 requested additional time to decide whether or not to accept or reject the proposal, and 35 did not respond.  Flanders Aff., ¶ 27.

Because only 2 of the 141 retirees agreed to reduce the amount of their pension benefits, on July 29, 2011, the Receiver determined that the only way to prudently return the City to viability would be through the filing of a Chapter 9 petition and confirmation of a prudent plan of debt adjustment.  Flanders Aff., ¶ 28.

As demonstrated by the forgoing chronology, the City has exhausted all other options and is forced to seek rejection of the CBAs.

### III. DISCUSSION

**A.**     **The Court Should Approve the City's Rejection of the CBAs Pursuant to Chapter 9 and Controlling Precedents.**

**1.**     **The City is Authorized to Reject the CBAs.**

Chapter 9 of the Bankruptcy Code governs bankruptcies of municipalities.   Section 901(a) expands Chapter 9 to include certain selected sections of Chapters 3, 5, and 11 of Title 11. However, "not all sections are incorporated into Chapter 9 because some sections would frustrate the unique purpose of municipal debt adjustment proceedings."  *Int'l Bhd. of Elec. Workers v.*

*City of Vallejo*, 432 B.R. 262, 267 (Bankr. E.D. Cal. 2010) (citing Collier on Bankruptcy, ¶ 901.01 (2010)).

Subject to certain limitations, Section 365(a) of the Bankruptcy Code authorizes a debtor to assume or reject any executory contract. It provides:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee[4], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a). Section 901(a) identifies particular provisions in the Bankruptcy Code that apply in a Chapter 9 case. Bankruptcy Code § 365 is incorporated into Chapter 9 under § 901(a). Thus, a debtor in a Chapter 9 case, such as the City, is authorized to reject executory contracts.

Bankruptcy Code does not define the term "executory contract." However, the legislative history of § 365(a) indicates that Congress intended the term to mean a contract "on which performance remains due to some extent on both sides." *Bildisco*, 465 U.S. at 522 n.6 (quoting H.R. Rep. No. 95-595, p. 347 (1977); *see* S. Rep. No. 95-989, p. 58 (1978)). The most-cited definition of an "executory contract" is a contract:

> under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.

V. Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973).

In *Bildisco*, the Court held that Congress intended that 11 U.S.C. § 365(a) apply to all CBAs. 465 U.S. at 524. It further held that a CBA "is an executory contract." *Id*. at 521-23 & n.6 ("We reject the argument of amicus United Mine Workers of America that a collective-bargaining agreement is not an executory contract within the meaning of § 365(a)."). Accordingly, the City, as a Chapter 9 debtor, is authorized to reject the CBAs and the

---

[4] Section 365 refers to the trustee's authority to reject executory contracts. However, a reference to "trustee" in any Bankruptcy Code section made applicable to Chapter 9 means the debtor. See 11 U.S.C. § 902(5).

Bankruptcy Court may approve rejection of such CBAs upon an appropriate showing by the City.

### 2.      Under the *Bildisco* Standards, the City may Reject the CBAs.

The *Bildisco* court addressed whether a Bankruptcy Court considering rejection of a collective bargaining agreement should be governed by a higher standard than the "business judgment" standard which is the ordinary standard for contract rejection.  465 U.S. at 524.  After reviewing various lower court decisions, the Court concluded that a "somewhat stricter standard" than the "business judgment" standard should govern the determination of whether or not a debtor should be authorize to reject a collective bargaining agreement.  *Id.*

In determining the appropriate standard, the Court rejected the more stringent standard under the *REA Express* line of cases which hold that a debtor should only be authorized to reject a collective bargaining agreement if it can prove that its reorganization would fail without permission to reject.  *See id.* at 524-25.  Rather, the Court adopted a more liberal test, namely that rejection of a collective bargaining agreement should be authorized under § 365(a) if:  (1) the debtor can show that the collective bargaining agreement burdens the estate[5]; (2) after careful scrutiny, the equities balance in favor of rejecting the labor contract; and (3) "reasonable efforts to negotiate a voluntary modification have been made, and are not likely to produce a prompt and satisfactory solution."  *See In re City of Vallejo*, 403 B.R. 72, 78 (Bankr. E.D. Cal. 2009) (citing *Bildisco*, 465 U.S. at 526); *see also Bildisco*, 465 U.S. at 526 ("If the parties are unable to agree, a decision on the rejection of the collective-bargaining agreement may become necessary to the reorganization process.").

---

[5] "In a Chapter 9 case there is no 'estate.'  Thus, a municipal debtor must demonstrate that the collective bargaining agreement burdens its ability to reorganize by proposing and implementing a viable plan of debt adjustment."  *In re City of Vallejo*, 403 B.R. 72, 78 n.2 (Bankr. E.D. Cal. 2009) (citing *Bildisco*, 465 U.S. at 525-26).

Even though *Bildisco* involved a Chapter 11 debtor-in-possession, the Bildisco standard also applies in a Chapter 9 case. *See City of Vallejo*, 403 B.R. at 78 ("Therefore, section 1113 is not applicable in Chapter 9 cases, and a Chapter 9 debtor is not required to comply with it in order to reject an executory collective bargaining agreement.")

> **3.    The Standards Established by *Bildisco* Were Not Altered by 11 U.S.C. § 1113 in Chapter 9 Cases.**

Labor unions reacted strongly to *Bildisco*.  *See In re County of Oran*ge, 179 B.R. 177, 182-83 (Bankr. C.D. Cal. 1995).   In response, within months after the *Bildisco* decision, Congress enacted Section 1113 of the Bankruptcy Code which, among other things, "applies in chapter 11 cases and imposes on chapter 11 debtors procedural and substantive requirements that must be met prior to rejection of collective bargaining agreements." 11 U.S.C. § 1113(f); *see City of Vallejo*, 403 B.R. at 77.  However, Congress did ***not*** amend Chapter 9 to incorporate new Section 1113.  *See County of Orange*, 179 B.R. at 182-83.

Bankruptcy Code § 901 incorporates by reference numerous Code sections but § 1113 is conspicuously omitted.  Congress did not make § 1113 applicable to Chapter 9 when it passed the Bankruptcy Reform Act in 1994.  *See County of Orange*, 179 B.R. at 183 & n. 15.  With the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress had yet another opportunity to incorporate § 1113 into Chapter 9, but opted not to do so.  The Bankruptcy Court holding in *City of Vallejo*, confirms that the *Bildisco* standard for rejecting collective bargaining agreements, not § 1113, remains the governing standard for rejecting a collective bargaining agreement in a Chapter 9 case.  432 B.R. at 272 ("Congress, not the Court … should decide whether to incorporate Section 1113-like provisions into Chapter 9 … in the absence of such legislation . . . [t]he Court finds *Bildisco* and *In re County of Orange* to be persuasive authorities for analyzing and determining the appropriate standard for municipalities

to reject a CBA during Chapter 9 bankruptcy.  Accordingly, the Court affirms the Bankruptcy

Court's use of the *Bildisco* standard."); *see also City of Vallejo*, 403 B.R. at 77-78; *County of*

*Orange*, 179 B.R. at 182-83 ("Given this history, I conclude that *Bildisco* applies in Chapter 9

since Congress has had numerous opportunities to limit its effect by incorporating § 1113 into

Chapter 9").

 The bankruptcy court in *County of Orange* reasoned that Congress may have decided

against adding § 1113 to Chapter 9 out of concern about encroaching on states rights under the

Tenth Amendment.  U.S. Const. amend. X; *County of Orange*, 179 B.R. at 183 n.15. "Without a

§ 1113, states are able to decide on their own whether to allow a municipality to file for

bankruptcy under Chapter 9 (and have the power to reject union contracts), or not." *City of*

*Vallejo*, 432 B.R. at 271.

 In sum, the *Bildisco* standards for court approval of the rejection of a collective

bargaining agreement apply in Chapter 9, and a Chapter 9 debtor may unilaterally reject a

collective bargaining agreement immediately after filing its petition.

 **B.** **The City Satisfies the *Bildisco* Standards for Rejection of the CBAs.**

  **1.** **The CBAs Burden the City's Ability to Reorganize and, Absent
Rejection, Will Prevent the City from Implementing a Viable Plan of
Debt Adjustment.**

 The first element of the *Bildisco* test for determining whether the City may reject the

CBAs is whether the CBAs burden the City's "estate."  465 U.S. at 526.  In the context of a

municipal bankruptcy case where there is no "estate," and the municipality retains control over

its assets and its debt restructuring (*see* 11 U.S.C. § 904), this equates to a showing that the

collective bargaining agreement burdens the municipality's ability to reorganize (i.e., burdens its

ability to propose and implement a viable plan of debt adjustment). *See id.* at 525-26.

The CBAs severely burden the City's ability to develop a plan of debt adjustment.  This is best demonstrated by comparing the City's projected financial performance if it does not make changes authorized under Chapter 9 on the hand, versus the City's projected financial performance if it makes changes authorized under Chapter 9 including, rejecting the CBAs on the other hand.  Exhibit B to the Corrigan Finances Affi. makes this comparison on a budgetary basis; Exhibits C and D to the Corrigan Finances Affi. makes this comparison on a cash flow basis.

Exhibit B, copied onto the following page, compares a projected FY 2012 Budget without changes to the CBAs and other changes authorized under Chapter 9 (under the column "Unbalanced") against a projected FY 2012 Budget with changes to the CBAs and other changes authorized under Chapter 9 (under the column "Balanced").

| Summary Central Falls FY2012 Budgets Adopted | | | |
|---|---|---|---|
| Item | Unbalanced | Balanced | Variance |
| Tax Revenue | 12,136,255 | 12,136,255 | - |
| Non-Tax Revenue | 931,850 | 931,850 | - |
| State Revenue | 2,437,185 | 2,437,185 | - |
| Department Revenue | 301,050 | 188,550 | (112,500) |
| Other Revenue | 629,682 | 629,682 | - |
| Total Revenue | 16,436,022 | 16,323,522 | (112,500) |
| | | | |
| Mayor's Office | 27,989 | 27,989 | - |
| Receivers Council | 1,582 | 1,582 | - |
| City Clerk | 227,659 | 214,603 | (13,056) |
| HR/Benefits | 47,130 | 71,589 | 24,459 |
| Legal | 162,740 | 119,639 | (43,101) |
| Tax Assessor | 180,715 | 177,308 | (3,407) |
| Finance | 483,181 | 465,855 | (17,326) |
| Board of Canvassers | 35,230 | 35,230 | - |
| City Property | 669,392 | 525,620 | (143,772) |
| City Boards | 12,000 | 12,000 | - |
| Police | 5,237,174 | 3,155,915 | (2,081,259) |
| Fire | 5,367,715 | 3,258,545 | (2,109,170) |
| Probate Court | 7,868 | 7,868 | - |
| Municipal Court | 100,091 | 68,655 | (31,436) |
| Animal Control | 25,000 | 25,000 | - |
| Inspection Officers | 13,961 | 9,307 | (4,654) |
| Code Enforcement | 204,405 | 172,322 | (32,083) |
| Highway | 1,266,821 | 1,066,799 | (200,022) |
| Public Works | 371,420 | 344,531 | (26,889) |
| Library | 29,130 | 18,692 | (10,438) |
| Recreation | 65,585 | 39,964 | (25,621) |
| Planning & Community | 58,236 | 96,516 | 38,280 |
| Community Center | 6,819 | 6,819 | - |
| Munipal Debt | 2,656,630 | 2,611,775 | (44,855) |
| Contingencies | 526,000 | 526,000 | - |
| Employee Benefits | 2,927,572 | 2,270,183 | (657,389) |
| Police Retirement | 629,297 | 480,820 | (148,478) |
| Fire Retirement | 695,053 | 512,393 | (182,660) |
| Major Purchases | - | - | - |
| Total Expenditures | 22,036,396 | 16,323,522 | (5,712,874) |
| | | | |
| Surplus/(Deficit) | (5,600,374) | - | |

In the Unbalanced and the Balanced budgets, revenues are projected at $16.4 million and $16.3 million, respectfully.  However, in the Unbalanced budget, expenditures are projected at approximately $22 million as compared to the Balanced budget which projects expenditures at only $16.3 million.  The Unbalanced budget produces a deficit of approximately $5.6 million while the Balanced budget is balanced.

The third column in Exhibit B, is entitled "Variance."  Many of the changes producing significant savings in the Balanced FY 2012 Budget, are changes in the active labor force either by reduction, consolidation or shared services which would be prohibited under the terms of the CBAs.  Corrigan Finances Aff., ¶ 25.

Similarly, Exhibits C and D, compare cash flow projections for FY 2012 without making changes to the CBAs and other changes authorized under Chapter 9 against cash flow projection for FY 2012 Budget with changes to the CBAs and other changes authorized under Chapter 9 including rejection of the CBAs.  These two charts are copied onto the following pages.

**Central Falls FY2012 Unbalanced Budget Cash Flow Projections**

| | FY12 Unbalanced | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Jun-12 Sum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 2 | 2 | 2 | 2 FY2012 |
| **Inflows** | | | | | | | | | | | | | | |
| Tax Revenue | 12,150,255 | 3,044,140 | 128,000 | 812,000 | 1,315,000 | 765,800 | 1,641,000 | 1,150,000 | 600,000 | 1,960,000 | 1,021,000 | 359,000 | 669,215 | 12,138,255 |
| Non-Tax Revenue | 931,850 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,665 | 931,850 |
| State Revenue | 2,437,185 | 246,460 | 177,153 | 7,482 | 895,676 | 31,047 | 7,482 | 7,482 | 31,047 | 153,568 | 890,976 | 31,047 | 7,482 | 2,437,185 |
| Departmental Revenue | 188,550 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 188,550 |
| Other Revenue | 629,682 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 626,682 |
| Total Revenue | 16,323,622 | 3,436,441 | 450,973 | 965,322 | 2,327,616 | 962,787 | 1,184,322 | 1,303,322 | 775,887 | 1,479,409 | 2,033,816 | 546,887 | 843,533 | 16,323,522 |
| | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | |
| Payroll, incl taxes | 6,522,813 | 482,966 | 499,333 | 707,343 | 495,139 | 485,139 | 507,651 | 514,878 | 514,878 | 736,650 | 514,878 | 514,878 | 522,413 | 6,505,046 |
| Benefits | 3,559,747 | 1,221,769 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 299,480 | 4,516,049 |
| Jail Payments | 3,675,000 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 306,250 | 3,675,000 |
| 1% Pension (Payroll) | 1,324,350 | 100,000 | 109,000 | 109,000 | 109,000 | 109,000 | 109,000 | 111,725 | 111,725 | 111,725 | 111,725 | 111,725 | 111,725 | 1,324,350 |
| City Property | 219,658 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 18,305 | 216,658 |
| Legal & Professional | 378,000 | 39,667 | 39,667 | 44,667 | 27,167 | 27,167 | 27,167 | 37,167 | 27,167 | 27,167 | 27,167 | 27,167 | 27,167 | 374,133 |
| Insurance | 330,711 | 86,421 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 33,071 | 332,711 |
| Police Other | 345,000 | 26,776 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 28,750 | 412,671 |
| Fire Other | 189,000 | 40,259 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 191,776 |
| Admin Other | 392,692 | 11,213 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 32,724 | 400,226 |
| DPW Other | 189,500 | 5,786 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 15,792 | 184,221 |
| Public Works | 371,420 | 473,303 | 30,852 | 30,852 | 30,852 | 30,852 | 30,852 | 30,852 | | 30,852 | 30,852 | 30,852 | 30,862 | 348,234 |
| Debt | 2,656,630 | | 44,655 | 175,125 | 203,010 | 203,010 | 162,303 | 162,303 | | | 785,126 | 813,010 | | 2,650,630 |
| Contingencies | 200,000 | | | | | | | | | | | 100,000 | | 200,000 |
| Unemployment | 82,100 | 8,658 | 16,000 | 16,000 | | 8,500 | 8,500 | 8,500 | | | | | 50,000 | 82,159 |
| Compensated Absences | | | | | | | | | | 50,000 | | | 50,000 | 54,787 |
| Total Expenditures | 20,459,671 | 2,850,372 | 238,030 | 1,719,178 | 1,602,755 | 1,675,140 | 1,432,941 | 1,664,795 | 1,534,093 | 1,705,169 | 2,216,218 | 2,397,703 | 1,458,557 | 21,966,353 |
| | | | | | | | | | | | | | | |
| **Unpaid FY11 Expenditures** | 374,992 | 772,500 | 150,248 | 150,248 | 150,248 | 160,248 | | | | | | | 50,000 | 600,992 |
| Beginning Balance | | 772,500 | 1,361,570 | (84,888) | (948,142) | (374,326) | 962,787 | (1,234,928) | (1,473,247) | (2,591,929) | (2,550,929) | (2,818,684) | (3,004,686) | (4,855,391) |
| Total Revenues | | 3,436,441 | 450,973 | 965,322 | 2,327,616 | 962,787 | 1,184,322 | 1,303,322 | 775,887 | 1,479,409 | 2,033,816 | 546,887 | 843,533 | |
| Total Expenditures | | (2,850,372) | (64,883) | (1,867,581) | (1,759,005) | (1,923,389) | (1,432,941) | (1,664,795) | (1,534,093) | (1,705,169) | (2,219,218) | (2,397,103) | (4,855,391) | |
| End Balance | | 1,361,570 | (64,883) | (949,142) | (374,326) | (1,234,928) | 962,787 | (1,473,247) | (2,591,929) | (2,818,684) | (3,064,086) | (4,856,301) | (6,470,326) | |

**Central Falls FY2012 Balanced Budget Cash Flow Projections**

| | FY12 Balanced | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 | Jun-12 | Sum FY2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows** | | | | | | | | | | | | | | |
| Tax Revenue | 12,136,285 | 3,044,442 | 128,000 | 612,000 | 1,315,000 | 786,900 | 1,041,000 | 1,152,000 | 650,000 | 1,180,000 | 1,021,000 | 369,000 | 690,215 | 12,136,285 |
| Non-Tax Revenue | 931,890 | 77,655 | 77,654 | 77,492 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,654 | 77,655 | 931,890 |
| State Revenue | 2,437,185 | 249,460 | 177,133 | 505,970 | 31,647 | 31,647 | 31,647 | 31,047 | 31,047 | 153,598 | 666,978 | 310,047 | 7,482 | 2,437,185 |
| Department Revenue | 188,550 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 15,712 | 188,550 |
| Other Revenue | 629,882 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 52,473 | 629,889 |
| **Total Revenue** | 16,323,522 | 3,439,441 | 450,973 | 966,522 | 2,327,916 | 962,787 | 1,194,322 | 1,303,522 | 780,687 | 1,476,408 | 2,633,818 | 545,887 | 843,538 | 16,323,522 |
| | | | | | | | | | | | | | | |
| **Expenditures** | | | | | | | | | | | | | | |
| Payroll and Taxes | 3,810,000 | 482,666 | 426,550 | 623,918 | 402,042 | 367,524 | 367,524 | 219,476 | 219,476 | 310,647 | 218,279 | 218,279 | 218,279 | 4,073,596 |
| Benefits | 1,796,125 | 1,221,789 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 148,844 | 2,859,060 |
| JH Payments (Pay/pb) | 1,155,000 | | | | | | | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 96,250 | 962,500 |
| 1% Pension (Pay/pb) | 995,000 | 108,000 | 108,000 | 98,250 | 95,250 | 96,250 | 96,250 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 82,917 | 1,047,167 |
| City Property | 222,000 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 18,500 | 222,000 |
| Legal & Professional | 362,000 | 29,333 | 29,333 | 26,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 29,333 | 357,967 |
| Insurance | 250,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 29,000 | 250,000 |
| Police Other | 252,000 | 96,421 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 327,421 |
| Fire Other | 1,044,000 | 26,776 | 8,800 | 8,600 | 8,800 | 8,800 | 8,800 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 166,667 | 1,270,776 |
| Admin Other | 507,560 | 49,259 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 42,297 | 525,522 |
| DPW Other | 566,500 | 11,213 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 47,208 | 520,505 |
| Public Works | 344,550 | 6,766 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 28,713 | 321,603 |
| Debt | 2,656,630 | 473,303 | 44,856 | 175,125 | 175,125 | 203,010 | | 162,203 | | | 785,125 | 813,010 | | 2,656,630 |
| Contingencies | 200,000 | | | | | | | | 100,000 | | | 100,000 | | 200,000 |
| Unemployment | 760,000 | 8,658 | 18,000 | 36,000 | 45,000 | 45,000 | 45,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 789,658 |
| Compensated Absences | 472,500 | 14,167 | 8,000 | 17,500 | 20,000 | 20,000 | 22,500 | 50,000 | 340,000 | | | | | 475,287 |
| **Total Expenditures** | 15,433,865 | 2,544,317 | 977,129 | 1,229,279 | 1,100,029 | 1,190,895 | 997,686 | 1,222,409 | 1,470,207 | 1,121,325 | 1,614,139 | 1,942,017 | 1,090,007 | 16,091,680 |
| | | | | | | | | | | | | | | |
| Unpaid FY11 Expenditures | 374,992 | | | | | | | | | | | | | |
| Beginning Balance | 772,500 | 772,500 | 1,667,624 | 1,141,468 | 877,512 | 2,016,299 | 1,790,192 | 1,194,022 | 1,963,629 | 2,074,542 | 1,341,232 | 1,730,256 | 1,958,340 | 562,811 |
| Total Revenues | | 3,439,441 | 450,973 | 966,522 | 2,327,916 | 962,787 | 1,194,322 | 1,303,522 | 780,687 | 1,476,408 | 2,633,818 | 545,887 | 843,538 | 1,038,022 |
| Total Expenditures | | (2,544,317) | (977,129) | (1,229,279) | (1,190,095) | (1,189,895) | (1,799,192) | (689,885) | (1,222,279) | (1,470,207) | (1,121,325) | (1,614,132) | (1,942,017) | (1,930,022) |
| **End Cash Balance** | | 1,667,624 | 1,141,468 | 877,512 | 2,016,299 | 1,790,192 | 1,194,022 | 1,963,629 | 2,074,542 | 1,341,232 | 1,730,256 | 1,958,340 | 562,811 | 406,342 |

The "Central Falls FY 2012 Unbalanced Cash Flow Projections" (page 23)  demonstrate that if no changes are made, the City will not be able to pay its debts as they become due in September 2011, November 2011, December 2011, January 2012, February 2012, March  2012, April 2012, May 2012 and June 2012.  However, the "Central Falls FY 2012 Balanced Cash Flow Projections" (page 24) demonstrate that if the City makes changes to the CBAs, and other changes authorized under Chapter 9, the City will be able to pay its debts as they come due throughout FY 2012.

This demonstrates that the CBAs burden the City's ability to reorganize.

### 2.        The Equities Balance in Favor of Rejecting the CBAs

The second element of the *Bildisco* test for determining whether the Bankruptcy Court should approve the rejection of a collective bargaining agreement is whether, after careful scrutiny, the equities balance in favor of rejecting the collective bargaining agreements.  *See Bildisco*, 465 U.S. at 526-27.  The debtor need not demonstrate that rejection is necessary for a successful reorganization.  *City of Vallejo*, 432 B.R. at 274-75 (citing *Bildisco*, 465 U.S. at 527). In balancing the equities, "'the Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to the issue.'"  *City of Vallejo*, 432 B.R. at 274-75 (quoting *Bildisco*, 465 U.S. at 527).  Moreover, although there may be no outer limits on what a court may consider under this broad, flexible test,  *Bildisco*'s reminder that Bankruptcy Courts "must focus on the ultimate goal of Chapter 11 when considering these equities"  must be kept in mind.  *See Truck Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 92  (2d Cir. 1987) (citing to *Bildisco*, 465 U.S. at 527)).

In *Truck Drivers*, the Court of Appeals for the Second Circuit recited factors it considered to be part of the analysis of the balance of the equities:

(1)     the likelihood and consequences of liquidation if rejection is not permitted;

(2)     the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

(3)     the likelihood and consequences of a strike if the bargaining agreement is voided;

(4)     the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

(5)     the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

(6)     the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Id* at 93.   Each of these factors should be viewed in the context of a debtor's attempt to reorganize.  *In re Northwest Airlines Corp.*, 346 B.R. 307, 329 (S.D.N.Y. 2006)    In addition, in balancing the equities, consideration must also be given to the policy pronouncements of the legislature.  *NASA v. Fed. Labor Relations Auth.*, 527 U.S. 229, 245 (1999); *see, e.g., Picker Int'l v. Kodak Caribbean, Ltd.*, 826 F. Supp. 610, 613 (D.P.R. 1993) (public interest may be declared in the form of a statute) .

Here, the equities tip heavily in favor of rejection.  The City must continue to operate and provide essential governmental functions to its residents on an uninterrupted basis.  *Cf. Vallejo*, 408 B.R. at 298 (recognizing same).  Unless the CBAs are rejected, the City will be "upside-down" financially and will be unable to pay its debts as they become due in September 2011, November 2011, December 2011, January 2012, February 2012, March  2012, April 2012, May 2012 and June 2012.  Without rejection, the City will default on its pension obligations and other obligations.  It might even default on its bond obligations which would have enormous policy implications beyond Central Falls.

A default by Central Falls could also detrimentally affect the credit ratings of Rhode Island's other municipalities and perhaps, the State of Rhode Island's credit rating as well. *Moreau v. Flanders*, 15 A.3d 565, 581-82 (R.I. 2011) (quoting *Marran v. Baird*, 635 A.2d 1174,

1178-79 (R.I. 1994)).  That is why the General Assembly announced its policy purpose for the

Fiscal Stability Act as its first section:

> **Declaration of policy and legal standard. –** It shall be the policy of the state to
> provide a mechanism for the state to work with cities and towns undergoing
> financial distress that threatens the fiscal well-being, public safety and welfare of
> such cities and towns, or other cities and towns or the state, with the state
> providing varying levels of support and control depending on the circumstances.
> The powers delegated by the General Assembly in this chapter shall be carried out
> having due regard for the needs of the citizens of the state and of the city or town,
> and in such a manner as will best preserve the safety and welfare of citizens of the
> state and their property, and the access of the state and its municipalities to capital
> markets, all to the public benefit and good.

R.I. Gen. Laws § 45-9-1; *see also Moreau*, 15 A.3d at 582 (rejecting substantive due process

challenge to the Fiscal Stability Act brought by the Mayor of Central Falls).  As all three

branches of Rhode Island's government have recognized, the problems in Central Falls have

ramifications for the rest of the State.

The City is sensitive to the extraordinary sacrifice it is seeking from its active employees

and retirees.  It is terrible thing for City employees to lose their jobs in the current fiscal

environment; it may be even worse to have their pension and health insurance benefits reduced.

But the simple reality is that the City will not have the revenues to meet its operational, payroll,

credit, pension, health insurance and other obligations without rejection of the CBAs and

utilization of its other Chapter 9 special powers.  That result would be contrary to the purpose of

Chapter 9 and the Bankruptcy Code and the State's express policy directive in § 45-9-1.  *See*

*Bildisco*, 465 U.S. at 527 ("The Bankruptcy Code does not authorize free-wheeling consideration

of every conceivable equity, but rather only how the equities relate to the success of the

reorganization.").  Thus, the City the equities and the critical State policy considerations strongly

favor the rejection of the CBAs.

3.   **Reasonable Efforts to Negotiate a Voluntary Modification Were Made, and Continued Efforts Outside of Chapter 9 are Not Likely to Produce a Prompt and Satisfactory Solution**.

The final part of the *Bildisco* test inquires whether reasonable efforts were made to negotiate a voluntary modification, and whether continued negotiations are likely to produce a prompt and satisfactory solution. 465 U.S. at 526.

As set forth in detail in pages 9-11 *supra*, the City and the Unions made extensive efforts to negotiate workable modifications to the CBAs.

The City's management bargaining team made it known to each of the Unions that bankruptcy was a strong possibility unless, among other things, substantial changes were made to the existing CBAs and the future pension benefits of active members, a bankruptcy would be inevitable. As part of those negotiations, the City's management bargaining team presented to each of the Unions a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of Chapter 9 became necessary. The City and each of the Unions continued to bargain in an effort to reach an agreement or, if bankruptcy was necessary, in order to develop a plan of adjustment, or parts thereof, to be presented to the Bankruptcy Court.

The bargaining with each of the Unions was undertaken in good faith. The City's management bargaining team was direct and open with each of the Unions. The Unions, for their part, were respectful, cooperative and appeared to be bargaining in good faith as well. They each indicated on several occasions that they were concerned about reaching an agreement and then finding out that they would be asked for further concessions.

During negotiations, the City expressed to each of the Unions that it was attempting to unify certain benefits and terms and conditions of employment. The City's management bargaining team also had confidential "off the record" conversations with certain unions where

particular proposals were discussed in an effort to reach agreements.   Notwithstanding the

parties' efforts, the City and the Unions was unable to reach agreement on new collective

bargaining agreements.

Given the City's dire financial situation and Unions' unwillingness to make concessions

prior to bankruptcy, and the Police Union and the Firefighters' Union concern that they would

reach an agreement and then be asked for further concessions, further negotiations outside of

Chapter 9 are unlikely to result in a prompt and satisfactory solution.   Corrigan Labor

Negotiations Aff. ¶¶ 17, 22.

Thus, as reasonable efforts were made to negotiate a voluntary modification, and

continued negotiations are likely to produce a prompt and satisfactory solution, Court approval

of the City's rejection of the CBAs is appropriate.   *See, e.g., In re Bloss Glass Co.*, 39 B.R. 694,

695-96 (Bankr. M.D. Pa. 1984) (rejection of collective bargaining agreement appropriate under

*Bildisco* where company met with labor unions pre-petition to explore solutions, attempted to cut

expenses in other areas, e.g., cut management position and renegotiate lease, was paying the

highest wages in the area and absent rejection, the company would not be able to reorganize).

### C.   Under *Bildisco,* the City may Immediately and Unilaterally Reject the CBAs Pending the Court's Consideration of this Motion.

The City is authorized under *Bildisco* and the rejection power provided by § 365 to

unilaterally reject the CBAs pending the Court's determination of this Motion.   In *Bildisco*, the

Supreme Court held that "the filing of the petition in bankruptcy means that the collective-

bargaining agreement is no longer immediately enforceable, and may never be enforceable

again."   465 U.S. at 531.   Because the collective bargaining agreement was rendered

unenforceable by filing the bankruptcy petition, unilateral rejection of the contract was proper

within the bankruptcy case.   *See, e.g., In re S.A. Mech., Inc.*, 51 B.R. 130, 131 (Bankr. D. Ariz.

1985) ("The *Bildisco* decision establishes an equitable standard by which to measure rejection of an executory contract and permits [the debtor] to ignore its union agreement immediately upon filing its bankruptcy case.").

The same is true here.  As the City filed its Chapter 9 petition today, the CBAs are immediately unenforceable against the City and will remain so City unless and until this Court determines that the CBAs must be assumed.  *See Bildisco*, 465 U.S. at 531.  As the *Bildisco* Court explained, to hold otherwise would defeat the very purpose of the contract rejection power provided under the Bankruptcy Code and obstruct the debtor's basic ability to reorganize and emerge from bankruptcy:

> While all parties to these cases ultimately concede that the Bankruptcy Court may authorize rejection of a collective-bargaining agreement, the Board and the Union nonetheless insist that a debtor-in-possession violates § 8(a)(5) and § 8(d) of the NLRA if it unilaterally changes the terms of the collective-bargaining agreement between the date of filing the bankruptcy petition and the date on which the Bankruptcy Court authorizes rejection of the agreement. [. . .]
>
> Though the Board's action is nominally one to enforce § 8(d) of that Act, the practical effect of the enforcement action would be to require adherence to the terms of the collective-bargaining agreement. But the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again. Consequently, Board enforcement of a claimed violation of § 8(d) under these circumstances would run directly counter to the express provisions of the Bankruptcy Code and to the Code's overall effort to give a debtor-in-possession some flexibility and breathing space.

465 U.S. at 529, 532

Based on *Bildisco*, unless and until the Bankruptcy Court determines that that the Municipal Workers' Union CBA, the Police Union CBA, and the Firefighters' Union CBA must be assumed, **the City shall treat the Municipal Workers' Union CBA, the Police Union**

**CBA, and the Firefighters' Union CBA as "no longer immediately enforceable."** *See* *Bildisco*, 465 U.S. at 532.[6]

    **D.**    **The City Must Reject the CBAs if it is to Successfully Develop and Implement a Plan of Debt Adjustment.**

In FY 2012, the City will be unable to pay the compensation and benefits it would be obligated to pay under the CBAs.  The City's financial projections for FY 2012 estimate that the General Fund deficit could exceed $5.6 million. Corrigan Finances Aff., ¶ 22; *Exhibit B*. Projected expenditures are estimated at approximately $22,036,396, which is based on the City's cost of labor for the service, compensation and pension benefit levels required under the current labor contracts.   Projected revenues are estimated at approximately $16,436,022. Corrigan Finances Aff., ¶ 22.  The largest projected expense to the City is labor, estimated to be in excess of $10 million of the budget for FY 2012, which includes payments for compensation, health benefits, other related benefits required by the CBAs, and payments of the City's actuarially required contribution to MERS, but not any payments to the John Hancock Plan or the 1% Plan. Corrigan Finances Aff., *Exhibit C*.

An additional impediment, and of equal importance to the reorganization of the City and its finances, are the terms and conditions of the CBAs pertaining to the terms of employment that restrict the ability of the City to restructure, outsource, downsize and privatize, such as minimum manning, staffing and overtime requirements.   Critical components of any viable plan of debt adjustment are reduction of expenditures resulting from:

---

[6] Section A(3) above explains that when Congress enacted Section 1113 of the Bankruptcy Code to provide stricter standards than those set forth in *Bildisco* in order for a debtor to reject a collective bargaining agreement, it chose not to incorporate those new standards into Chapter 9,  It should be noted that this Congressional decision not to incorporate Section 1113 into Chapter 9 included Section 1113(f) which provides: "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."

a.  Implementation of a new health insurance plan for retirees and changes to the pension plans for active employees and retirees, which would include a "Pay as You Go" plan for FY 2012 and the elimination of annual payments to the John Hancock Plan and 1% Plan for FY 2012.

b.  Implementation of changes to the Firefighters' CBA which would allow for consolidation, minimum staffing  reductions, restructuring of compensation and benefits and outsourcing of services.

c.  Implementation of changes to the Police CBA which would allow for consolidation, restructuring of compensation and benefits, and outsourcing of services.

d.  Implementation of changes to the Municipal Workers' Union's CBA which would allow for consolidation, restructuring of compensation and benefits, and outsourcing of services.

Corrigan Finances Aff., ¶ 35.

These objectives cannot be accomplished unless each of the CBAs are rejected.  Corrigan Finances Aff., ¶ 36.  Without substantial changes to the labor structure and delivery of City services, the City will not be able to pursue any plan for fiscal recovery in the absence of a substantial infusion of state or federal funds, which in this present economic climate is highly unlikely.

**E.      The City Has Satisfied the Negotiation Requirement Under Section 109(c)(5).**

Generally, Section 109(c)(5) requires that a Chapter 9 petitioner demonstrate that it has satisfied or is excused from certain pre-petition negotiations with creditors. See 11 U.S.C. §

109(c)(5); *Valley Health Sys.*, 383 B.R. at 161 (The purpose of Section 109(c)(5) is to promote

prepetition negotiations between debtor and creditors).  In order to be "eligible" for Chapter 9

relief, the debtor has the burden of demonstrating satisfaction of one of the following four (4)

criteria:

> (A) [it] has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

> (B) [it] has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

> (C) [it] is unable to negotiate with creditors because such negotiation is impracticable; or

> (D) [it] reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § (c)(5).

The City has satisfied the requirement to negotiate in good faith but has failed to obtain

the agreement of creditors holding a majority in amount of claims to be impaired.  11 U.S.C. §

(c)(5)(B).  The majority of the City's expenditures, and in this bankruptcy, the city's creditors,

are for costs and benefits to be paid to active employees and pensions and health benefits to be

paid to retirees. As part of its concerted efforts to avoid bankruptcy, the City has engaged the

Police Union, the Firefighters' Union and the Municipal Workers' Union in negotiations in good

faith, but the parties have been unable to reach an agreement. As demonstrated in the Flanders

Aff. and in Section II(D) above, the Receiver negotiated in good faith to seek voluntary

concessions from retirees or to seek an alternative plan from retirees to save the amount

necessary to avert bankruptcy or to affect a plan of recovery.  However, only 2 of the Central

Falls 141 retirees agreed to reduce their benefits.

In *In re McCurtain Mun. Auth.*, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), the bankruptcy court held that the debtor had satisfied the good faith negotiation test because of pre-petition offers to settle with the creditor whose debt gave rise to the debtor's financial difficulties. *Id.* at *5-6. As set forth in the Corrigan Labor Negotiation Aff. and in Section II(C) above, the City made significant efforts to negotiate with labor unions and retirees. Labor costs are indisputably the largest single expenditure in the City budget and the source of the overwhelming unfunded pension debt the City faces.

"[W]hile a complete plan is not required, some outline or term sheet of a plan which designates classes of creditors and their treatment is necessary.*" In re City of Vallejo*, 408 B.R. 280, 297 (B.A.P. 9th Cir. 2008). In the present case, the Police Union, the Firefighters' Union and the Municipal Workers' Union were each presented with a broad outline which would be the basis of a plan of adjustment if the Receiver determined that the filing of a petition under Chapter 9 became necessary. Corrigan Labor Negotiations Aff., ¶¶ 8, 14, 19. Despite the clear articulation that bankruptcy was likely, and their interests would be impaired under a bankruptcy plan if concessions could not be reached, negotiations with the labor unions and the retirees were unsuccessful.

Moreover, the history of negotiations with the labor unions and retires, demonstrates that the City satisfies the requirement that it is unable to negotiate with creditors because such negotiation is impracticable. 11 U.S.C. § 109(c)(5)(C). "'Impracticable' means 'not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.' In the legal context, 'impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it

would cause extreme and unreasonable difficulty.'" *City of Vallejo*, 408 B.R. at 298 (citing *Valley Health Sys.,* 383 B.R. at 163).

"Whether negotiations with creditors is impracticable depends upon the circumstances of the case." *Pierce County*, 414 B.R. at 713 (citing *Vallejo,* 408 B.R. at 298).  Impracticability often occurs when the debtor will have great difficulty negotiating with all of its creditors.  *New York City*, 427 B.R. at 276 (citing, inter alia, *Pierce County*, 414 B.R. at 713)  Impracticability also includes certain situations where assets would be at risk if time is taken to negotiate with creditors.  *Id.* (citing, inter alia, *Valley Health Sys.*, 383 B.R. at 163).

As with the municipal debtors in *Pierce County* and *Vallejo*, the City's extensive pre-petition efforts to reach concessions with the labor unions and retirees, and the fact that they were unsuccessful, supports the conclusion that it is impracticable for the City to continue to negotiate with creditors and resolve their claims outside of the bankruptcy process.  *See Pierce County*, 414 B.R. at 714 (holding that the debtor's failed efforts to settle with small portion of a class of litigants pre-petition and post petition, supported the conclusion "that it would have been impracticable, if not impossible, for the Debtor to negotiate and settle with all potential creditors prior to filing its Chapter 9 petition."); *Vallejo,* 408 B.R. at 298). (holding that since the labor costs comprised the largest slice of Vallejo's budget, it would have been futile to negotiate with other creditors without an agreement with the Unions.)

In addition, the City has numerous unsecured creditors, including approximately 150 trade creditors nationwide.  Negotiations with each would be fruitless in light of the failure of the labor unions as well as the retirees and the City to reach agreement.  This is so because labor costs and related health and pension benefits represent the bulk of the City's expenses and without reductions, no projected plan would be viable.  Furthermore, as the Receiver had

determined that there were no set of circumstances under which the City could return to viability without significant voluntary concession from the retirees, and only 2 of Central Falls' 141 retirees agreed to voluntarily reduce their benefits, the Receiver concluded that it would be impractical and bad faith for the Receiver to commence negotiations with trade creditors. Flanders Aff., ¶ 28.

## IV.   CONCLUSION

The City did everything reasonable feasible to avoid filing a petition under Chapter 9. It drastically cut services. It raised taxes to the maximum allowable. It attempted, without success, to negotiate voluntary concessions from the retirees and the unions that would allow the City to return to fiscal viability. It even requested a bailout from the State which may have set a precedent that the State could not afford. It finally reached the fork in the road and had to make a choice. In one direction lay Pritchard, Alabama, where that city has defaulted on its obligations and simply stopped making pension payments to its retirees. In the other direction lay Chapter 9 and the realistic hope of restructuring the City's finances and re-making Central Falls in a relatively short period of time into one of Rhode Island's viable financial communities. It chose to go down the road towards chapter 9.

In order to return the City to viability, the City must reject the Police Union CBA, the Firefighters' Union CBA and the Municipal Workers' Union CBA. If the City is required to assume these collective bargaining agreements, it will be only a matter of time until the City begins defaulting on its financial obligations. The City satisfies each of the standards in *Bildisco*.

For the reasons discussed herein, the City respectfully requests that the Court grant the City's Motion and approve the City's rejection of Police Union CBA, the Firefighters' Union

CBA and the Municipal Workers' Union CBA and grant to the City such further relief as may be

fair and reasonable under the circumstances.

**ROBERT G. FLANDERS, JR.,** in his capacity as
Receiver of Central Falls,
By his attorney,


/s/ Theodore Orson_____
Theodore Orson, Esq. (No. 3874)
Orson and Brusini Ltd.
325 Angell Street
Providence, RI 02906
(401) 861-0344
torson@orsonandbrusini.com

Dated:  August 1, 2011


CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2011, I electronically filed the within with the Clerk of
the Bankruptcy Court for the District of Rhode Island Using the CM/ECF System. The following
participants have received notice electronically:

Gary L. Donahue ustpregion01.pr.ecf@usdoj.gov


/s/ Theodore Orson, Esq.